300 F.3d 111
UNITED STATES of America, Appellee,v.Gary FRIEDMAN, Carlos Rodriguez, a/k/a Carlos Diaz, and Kenneth Friedman, a/k/a Keith Delellis, a/k/a Anthony Stewart, a/k/a Tony Russo, a/k/a Anthony Zito, Defendant-Appellants,Ruben Hernandez, a/k/a Junior, Charles Sanchez and Juan Galindo, a/k/a Puppet, a/k/a Anthony Ochoa, a/k/a Jason Boodran, Defendants.
Docket No. 98-1398(L).
Docket No. 98-1425.
Docket No. 98-1435.
United States Court of Appeals, Second Circuit.
Argued: March 4, 2002.
Decided: August 6, 2002.

COPYRIGHT MATERIAL OMITTED COPYRIGHT MATERIAL OMITTED Emily Berger, Assistant United States Attorney (Susan Corkery, Assistant United States Attorney, of counsel; Alan Vinegrad, United States Attorney, on the brief), United States Attorney's Office for the Eastern District of New York, Brooklyn, NY, for Appellee.
Margaret E. Alverson, New York, NY, for Defendant-Appellant Gary Friedman.
Gary Schoer, Syosset, NY, for Defendant-Appellant Kenneth Friedman.
Michael S. Washor (Gail E. Laser, Nicholas Pinto, on the brief), New York, NY, for Defendant-Appellant Carlos Rodriguez.
Before CALABRESI and CABRANES, Circuit Judges, and PRESKA, District Judge.*
JOSÉ A. CABRANES, Circuit Judge.

1
We consider here the convictions of Gary Friedman, an attorney who engaged in a wide variety of criminal conduct in the early and mid 1990s, including drug dealing, robbery, and extortion; Kenneth Friedman, Gary's brother, who assisted Gary in carrying out many of his crimes; and Carlos Rodriguez, a former client of Gary Friedman, who was convicted of participating in two of Gary's extortion schemes. The judgments of conviction were entered on July 10, 1998 (Kenneth Friedman) and July 27, 1998 (Gary Friedman and Rodriguez), after a jury trial in the United States District Court for the Eastern District of New York (Allyne R. Ross, Judge). Amended judgments of conviction, modifying appellants' sentences, were entered on August 20, 1998 (Kenneth Friedman), October 18, 2000 (Gary Friedman), and November 16, 2000 (Rodriguez).

2
When appellants' trial began, they stood charged in a twenty-three count superseding indictment as follows:

3
• Counts 1-4 charged Gary Friedman with participating in two separate conspiracies to distribute and possess with intent to distribute marijuana (in violation of 21 U.S.C. §§ 846 and 841(b)(1)(B)(vii)) and with two instances of possession with intent to distribute marijuana (in violation of 21 U.S.C. § 841(a)(1), (b)(1)(D));

4
• Count 5 charged Gary Friedman with possession of stolen art (in violation of 18 U.S.C. § 2315);

5
• Counts 6 and 7 charged Gary and Kenneth Friedman with conspiracy to extort Mark Levinas and Robert Marshall (in violation of 18 U.S.C. § 1951) and weapons possession in connection with that crime (in violation of 18 U.S.C. § 924(c)(1));

6
• Counts 8-10 charged Kenneth Friedman with conspiracy to commit extortion by collection of an unlawful debt (in violation of 18 U.S.C. § 894(a)(1)), interstate travel in aid of racketeering ("ITAR") (in violation of 18 U.S.C. § 1952(a)(2)), and weapons possession in connection with those crimes (in violation of 18 U.S.C. § 924(c)(1)), all related to the kidnaping of Anthony Buttitta in Florida;

7
• Counts 11-13 charged Kenneth Friedman with conspiracy to commit robbery (in violation of the Hobbs Act, 18 U.S.C. § 1951), travel in interstate commerce with the intent to commit a crime of violence (in violation of 18 U.S.C. § 1952(a)(2)), and weapons possession in relation to these crimes (in violation of 18 U.S.C. § 924(c)(1)), all related to an attempted robbery of D.J. Shiel, a drug dealer in Florida who Buttitta had identified as a potential robbery target;

8
• Counts 14-18 charged all three appellants with conspiracy to commit extortion (in violation of the Hobbs Act, 18 U.S.C. § 1951), attempted extortion (in violation of 18 U.S.C. § 1951), interstate travel in aid of racketeering (in violation of 18 U.S.C. § 1952(a)(2)), use of an interstate facility in aid of racketeering (in violation of 18 U.S.C. § 1952(a)(2)), and weapons possession in connection with these crimes (in violation of 18 U.S.C. § 924(c)(1)), all related to an alleged plot to extort Peter Kovach, which plot resulted in the deaths of Kovach and Ted Gould (the "California crimes");

9
• Counts 19-23 charged all three appellants with conspiracy to use extortionate means to collect and attempt to collect an extension of credit ("loan-sharking") (in violation of 18 U.S.C. § 894(a)(1)), substantive counts of loan-sharking (in violation of 18 U.S.C. § 894(a)(1)), and weapons possession in connection with loan-sharking (in violation of 18 U.S.C. § 924(c)(1)); Gary Friedman and Rodriguez were also charged with attempted loan-sharking (in violation of 18 U.S.C. § 894(a)(1)) and Rodriguez was charged with weapons possession in connection with that crime (in violation of 18 U.S.C. § 924(c)(1)), all related to the extortion of Bruce Wolosky.

10
Before the case was submitted to the jury, the District Court dismissed Counts 3 (possession with intent to distribute marijuana), 11-13, and 21 (the weapons possession count related to the first of the substantive loan-sharking charges). The jury acquitted Gary Friedman of Counts 2 (possession with intent to distribute marijuana), 4 (conspiracy to distribute and possess with intent to distribute marijuana), and 20 (loan-sharking), and it acquitted Kenneth Friedman of Counts 19 and 20 (conspiracy to commit loan-sharking and loan-sharking). The appellants were convicted of all of the remaining charges. The District Court sentenced Gary Friedman to an aggregate term of imprisonment for life plus 300 months, Kenneth Friedman to aggregate term of imprisonment for life plus 540 months, and Carlos Rodriguez to an aggregate term of imprisonment for 468 months.

11
On appeal, the Friedmans argue that evidence obtained as a result of a traffic stop should have been suppressed; that tape recordings of conversations between them over a jailhouse telephone should have been suppressed; that the Government failed to show an interstate nexus on the Hobbs Act counts; that the Government failed to establish venue for Gary's conviction for possession of stolen art; and that their sentences violated the teachings of Apprendi v. New Jersey, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000). Rodriguez challenges the sufficiency of the evidence with respect to his convictions for involvement in the California crimes.1 He also argues that certain hearsay testimony should not have been admitted and that the prosecutor's improper statements during closing arguments deprived him of a fair trial with respect to those charges.

12
Most of appellants' claims do not warrant extended discussion and are disposed of by a summary order entered simultaneously with this opinion. We write here only to address (1) the Friedmans' claim that tape recordings of conversations between them over a jailhouse telephone should have been suppressed; (2) Rodriguez's challenges to his convictions for involvement in the California crimes; and (3) the Friedmans' Apprendi claims.

13
We hold that (1) the notice received by Kenneth Friedman that telephone calls from the Torrence County Jail were monitored and recorded was sufficient to support a finding that the recordings of his calls introduced at trial fell within the "ordinary course" exception to Title III of the Omnibus Crime Control and Safe Streets Act of 1968, as amended, 18 U.S.C. § 2510 et seq., and, thus, were not obtained in violation of Title III; (2) Kenneth and Gary Friedman had no reasonable expectation of privacy in Kenneth's calls to Gary from the Torrance County Jail; (3) Carlos Rodriguez's convictions related to the California crimes were not supported by sufficient evidence that he knew the specific nature of the conspiracy or underlying crime; (4) because the fact of a victim's death resulting from an ITAR "crime of violence" may be used to impose a sentence greater than the otherwise-applicable statutory maximum, under Apprendi, a victim's death is an element of the offense that must be charged in the indictment and proved to a jury beyond a reasonable doubt; and (5) in this case, the failure to charge the jury with the issue of whether the deaths of Kovach and Gould were caused by the Friedmans' extortion of them was harmless. Accordingly, we reverse Rodriguez's convictions on Counts 14, 15, 16, 17, and 18, and otherwise affirm the judgments of the District Court.

I. BACKGROUND

14
We set forth only those facts necessary to decide the claims addressed in this opinion, and we view the evidence in the light most favorable to the Government. See Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).

A. The California Crimes

15
Gary Friedman was an attorney who practiced in New York. The evidence at trial showed that, in 1991, Friedman began committing crimes, including robbery, extortion, kidnapping, and drug dealing. Friedman's primary associate in committing these crimes was his brother, Kenneth. Howard Bloomgarden was a nightclub owner and a friend of Gary Friedman.

16
From 1992-1993, Bloomgarden sold marijuana in Miami. His supplier was Jorge Aguilar, a dealer based in California. Aguilar would obtain the marijuana in California and ship it to Bloomgarden in Florida by Federal Express. As shipments became larger and more frequent, Bloomgarden enlisted the help of his friend, Peter Kovach, who traveled to California and began arranging for shipments to travel by courier. Bloomgarden also expanded his marijuana trafficking to New York, where his longtime friend, Gary Friedman, led the operation.

17
In April 1993, a shipment of approximately 800 pounds of marijuana sent from California by Kovach was intercepted and seized by the authorities in Illinois en route to Florida. Kovach used the seizure as an opportunity to break free from Bloomgarden: he arranged a meeting with Aguilar and Jeff Tobin, a major marijuana customer, at which they decided to cut Bloomgarden and the Friedmans out of the operation. Bloomgarden was forcefully notified of his exclusion from the marijuana operation on June 8, 1993, during an aborted attempt — presumably, by agents of Aguilar — to kidnap him. Bloomgarden never forgave Kovach for the April 1993 seizure and its fallout.

18
In August 1994, Bloomgarden and Gary Friedman decided to reestablish Bloomgarden's marijuana business by kidnaping Kovach to obtain money and to reestablish a drug connection. Gary and Kenneth Friedman offered Gary's driver, Ruben Hernandez — who would eventually cooperate with the Government and serve as its star witness at trial — $10,000 and a cut of any future business if he would accompany Kenneth to California, where they would confront Kovach, try to obtain money from him, and reestablish contact with Aguilar. Hernandez testified that Kenneth told him that Gary would make the necessary travel arrangements and also would arrange to have a car and guns waiting for them when they arrived in California.

19
Later that month, Gary asked one of his clients — Bruce Wolosky, who worked in a car dealership — to run a credit check on Kovach in an attempt to locate Kovach. Wolosky told Gary that Kovach was listed as working at a business called Galleria Telecom in Torrance, California.

20
On September 6, 1994, another of Gary Friedman's clients, defendant-appellant Carlos Rodriguez, received a forty-three-minute telephone call from his childhood friend, Gus Malave, who was then living in San Diego, California. Two additional phone calls from Malave's house to Rodriguez's house of less than two minutes each were placed on September 13 and 14, 1994. Between September 7 and 24, 1994, Malave made multiple calls to a beeper number used by Edwin Torres, also known as "Q," an associate both of Rodriguez and of Kenneth Friedman. The Government stipulated at trial that there were no calls between Malave's house and Rodriguez's house after September 14, 1994.

21
On September 23, 1994, "Tracey Stewart" wired $3,000 from Queens, New York, to Gus Malave in San Diego. The parties stipulated at trial that Stewart was on Rodriguez's approved visitor list for the detention facility where he was being held at the time of trial, but no evidence was introduced as to their relationship during 1994. Hernandez testified at trial that, before the California trip, he heard from either Kenneth or Gary that Bloomgarden and Gary were to arrange for Rodriguez to wire money to Gus Malave.

22
The same day — September 23, 1994 — Gary, Kenneth, and Hernandez traveled to Torrance, California. Two days later, Malave arrived in Torrance with a car, and Malave provided guns to them later that week. As soon as Malave arrived with the car, the four men (Gary, Kenneth, Hernandez, and Malave) drove to the Galleria Telecom store. Malave entered the store, identified Kovach (from an old photograph), and took some store brochures as he left.

23
Over the next several days, the four men took turns stalking Kovach at the store, looking for an opportunity to kidnap Kovach while he was alone at night, near closing time. During this time period, Gary purchased duct tape, rubber gloves, and tinting sprays to use in the crime. Gary also arranged for further financing from Bloomgarden.

24
Gary left California near the end of September to attend to a court appearance in New York. From New York, Gary continued to provide direction and financing to the remaining men. To take Gary's place, Kenneth and Hernandez recruited Juan Galindo.

25
On October 10, 1994, Kenneth, Hernandez, and Galindo were arrested after their car was pulled over by the police and none of them was able to produce a driver's license or other identification.2 After their arrest, they were taken to the Torrance County Jail, where they provided false names. In the booking area of the jail, two telephones were provided for the use of inmates — a red phone for calls to attorneys, and a brown phone for all other calls, which would be recorded. In the area of the telephones, a sign read, in relevant part:

TELEPHONE CALLS

26
The arrestee has the right to make free telephone calls within the local calling area, or at his own expense if outside the local calling area, to three of the following:

27
1) An attorney of your choice or, if you have no funds, the public defender.

28
This phone call shall not be monitored, eavesdropped upon, or recorded.

29
2) A bail bondsman.

30
3) A relative.

31
4) Any other person.

32
Each cell at the jail also contained a pay telephone; there was no indication that the use of the pay telephone was restricted or that calls would be recorded. All calls from the in-cell pay phones, however, were recorded in accordance with facility policy.

33
Kenneth used the pay telephone in his cell to call Gary eight times; during some calls, Gary included Bloomgarden or a California attorney in a conference call. During the calls, Kenneth told Gary (in cryptic language) of the circumstances of the arrest and of their intention to kidnap Kovach. In discussing the possibility of bail, Gary told Kenneth that he would obtain a Los Angeles address for the jailed men to use:

34
K. FRIEDMAN: So, if I could get out on bail here, I could finish that.

35
G. FRIEDMAN: I understand. I'll have, I'll have an address for you there.

36
K. FRIEDMAN: Yeah.

37
G. FRIEDMAN: In L.A., that you can use.

38
K. FRIEDMAN: Um-hum.

39
G. FRIEDMAN: Okay?

40
K. FRIEDMAN: Yeah. What from Carl?

41
G. FRIEDMAN: Nope, from Betty.

42
Gov't Ex. 92, Tape 2, p. 14.

43
Gary further instructed Kenneth to call "Betty" at her home in the morning. Id. at Tape 2, p. 16-17. Gary eventually arranged for the California attorney to post bond so that Kenneth, Hernandez, and Galindo could be released before the California authorities realized that Kenneth was on work release from a previous sentence and that there was an outstanding warrant for Galindo's arrest. The men were released from jail on bail later that same day (October 10, 1994).

44
The next day — October 11, 1994 — Kenneth called Malave, who returned to Torrance to provide a new car and replacement guns. At trial, Hernandez testified that "Gary and Carlos [Rodriguez]" sent the money to Malave to buy the replacement car and guns. Hernandez admitted on cross-examination, however, that he had consistently told investigators in proffer sessions prior to trial that Kenneth arranged for the replacement items directly with Malave, and that the money for these items had been sent to Malave by Bloomgarden, not Rodriguez.

45
To avoid being arrested again (for lack of a driver's license) if their car was stopped, Kenneth, Hernandez, and Galindo asked Malave to become their driver, and he agreed. The four men then resumed stalking Kovach.

46
On October 26, 1994, Kenneth, Hernandez, and Galindo burst into the Galleria Telecom store and kidnapped Kovach and Ted Gould, a bystander who happened to be in the store at the time. With Malave acting as driver, the men took Kovach and Gould to a nearby motel. There, they tied up the victims and called Gary to update him. Gary told them that Bloomgarden would call. While they waited, they beat Kovach while asking for money, and thwarted an attempt by Kovach to escape.

47
Shortly thereafter, Bloomgarden called, spoke to Kovach, and demanded money. Kovach pleaded that he had none. Bloomgarden then spoke with Kenneth and approved the murder of Kovach and Gould. Kenneth, with the assistance of Hernandez and Galindo, then choked Kovach and Gould to death. Those three men placed the bodies of Kovach and Gould in the trunk of the car driven by Malave.

48
The next day, Kenneth called Gary, told him of the murders, and arranged for additional funds to return to New York. When Kenneth, Galindo, and Hernandez arrived in New York, Gary met them at the airport, angrily asking them how they could have been "so stupid," as they had been so recently arrested near Kovach's business with kidnaping paraphernalia and a brochure from the store.

49
After Kenneth told Gary that they had left the bodies with Malave, who was to dump them in Mexico, Gary had additional money wired to Malave. Rather than dispose of the bodies in Mexico, however, Malave did so by abandoning the car with the bodies in the trunk at an industrial strip in San Diego.

B. The Sentences

50
Although Counts 16 and 17 (the ITAR counts related to the California extortion plot) charged that the plot resulted in the deaths of Kovach and Gould, the jury was not charged with finding the fact of the murders beyond a reasonable doubt. Pursuant to 18 U.S.C. § 1952,3 an ITAR crime of violence that does not result in death carries a maximum penalty of imprisonment for a term of twenty years, while an ITAR crime of violence that results in death is punishable by a sentence up to and including a term of imprisonment for life. See 18 U.S.C. § 1952(a)(2)(B). Both Friedmans were sentenced to life on Counts 16 and 17 based on the District Court's own findings that they were responsible for the deaths of Kovach and Gould.4 Neither Gary nor Kenneth objected at trial to the lack of a charge requiring the jury to find whether death had resulted from the ITAR crimes, although Gary requested that the issue of whether the plot involved a plan to commit a "crime of violence"5 be submitted to the jury — a request that the District Court granted.

51
Although Count 1 (the marijuana conspiracy count) did not charge a specific drug quantity, and drug quantity was not charged to the jury, the District Court sentenced Gary to a term of imprisonment of forty years on Count 1 based on its own finding that the crime involved more that 100 kilograms of marijuana. Gary contested quantity at sentencing. Gary did not object at trial that quantity had not been charged to the jury, and he did not object to his sentence on Count 1 on the ground that his term of imprisonment exceeded the statutory maximum for a narcotics conspiracy involving an unspecified quantity of marijuana.

II. DISCUSSION

52
A. Suppression of the Tapes of Calls from the Torrance County Jail

53
Prior to trial, the Friedmans timely moved for suppression of the tapes of Kenneth's calls from the Torrance County Jail on the grounds that the tapes were obtained without a warrant in violation of Title III of the Omnibus Crime Control and Safe Streets Act of 1968, as amended, 18 U.S.C. §§ 2510-22 ("Title III"), and in derogation of their Fourth Amendment right to be free from unreasonable searches.

54
Title III generally prohibits the intentional interception of wire communications, such as telephone calls, without judicial authorization. See 18 U.S.C. §§ 2510-2522; see also United States v. Workman, 80 F.3d 688, 692 (2d Cir.1996). Recordings of unlawfully intercepted communications may not be used as evidence in any trial. See 18 U.S.C. § 2515.6 Title III excepts certain communications from its provisions, however, including communications where one of the parties has either expressly or impliedly consented to interception, see id. § 2511(2)(c), and communications intercepted through "any telephone or telegraph instrument, equipment or facility, or any component thereof ... being used by ... an investigative or law enforcement officer in the ordinary course of his duties," id. § 2510(5)(a).

55
Before the District Court, the Government argued that (1) the Friedmans impliedly consented to the recording because they were on notice that the jail recorded telephone calls, thus placing the recording within the ambit of Title III's "consent" exception, and (2) the recording was permissible pursuant to Title III's exception for interception by "an investigative or law enforcement officer in the ordinary course of his duties." The Friedmans argued that (1) Kenneth was not on notice that calls from the jail cell (as opposed to calls from the booking area) were subject to interception and, thus, did not impliedly consent, and (2) Title III's "ordinary course" exception did not apply because of the lack of notice.

56
The District Court rejected the Government's consent argument, holding that the notice Kenneth received from the sign implying that some phone calls would be recorded was insufficient, under our decisions in United States v. Workman, 80 F.3d 688, 692-94 (2d Cir.1996), United States v. Willoughby, 860 F.2d 15, 20 (2d Cir.1988), and United States v. Amen, 831 F.2d 373, 379 (2d Cir.1987), to support a finding that Kenneth had impliedly consented to the recording. See United States v. Friedman, Nos. 95-Cr-192, 96-Cr-182, 1996 WL 612456, at *18-*19 (E.D.N.Y. June 25, 1996).7 The District Court reasoned that, although "a reasonable person could understand [the sign in the booking area] to mean that [calls other than those to attorneys] would be subject to interception," the sign in the booking area did not provide notice that calls from the jail cell also were subject to interception sufficient to support the finding that Kenneth had impliedly consented to their interception. Id. at *19. Compare Workman, 80 F.3d at 692-94 (finding implied consent where a sign near all prison telephones warned that calls were subject to monitoring, the inmate handbook warned that calls were monitored, and the inmate indicated knowledge that the call might be monitored and used coded language during the call).

57
The District Court agreed with the Government, however, that the recordings fell within the "law enforcement exception," holding that the exception applied because (1) all calls were routinely taped (2) by law enforcement officers (3) pursuant to an existing policy and (4) Kenneth Friedman's calls were not singled out in any way. Friedman, 1996 WL 612456, at *21. With respect to the Friedmans' argument that, in order for recording to be "in the ordinary course" of a law enforcement officer's duties, notice had to be provided to those recorded, the District Court noted that "many of the courts that have ruled on the law enforcement exception in this context have noted that the recordings took place pursuant to an established policy of which the inmates had notice," see id. at *20 (citing United States v. Sababu, 891 F.2d 1308, 1329 (7th Cir.1989); United States v. Paul, 614 F.2d 115, 117 (6th Cir.1980)), but cited two cases — United States v. Van Poyck, 77 F.3d 285, 291-92 (9th Cir.1996), and United States v. Feekes, 879 F.2d 1562, 1565-66 (7th Cir.1989) — as not "relying" on notice in holding that the exception applied. Friedman, 1996 WL 612456, at *20 Accordingly, the District Court held that a lack of notice does not preclude a finding that recordings are made in the ordinary course of a law enforcement officer's duties. Id.

58
On appeal, the Friedmans do not challenge the District Court's factual findings but instead argue that it erred in holding that the exception applied absent notice.

59
Although the District Court interpreted Van Poyck and Feekes as not "relying" on the existence of notice, the inmates in those cases did, in fact, receive notice similar to the notice the inmates received in the situations presented in Workman and Amen, in which we held that the notice received by the inmates was sufficient to support a finding that they had impliedly consented to having their calls recorded. See Workman, 80 F.3d at 693 (notice provided in signs at telephones, in orientation handbook, and in state regulations); Amen, 831 F.2d at 379 (notice provided in Code of Federal Regulations, at a lecture discussing the taping procedure, in the Inmate Information Handbook, in notices posted on the telephones, and in a form to be signed by inmates consenting to the procedure); Van Poyck, 77 F.3d at 292 (observing that the circumstances presented were "nearly identical" to those in Amen); Feekes, 879 F.2d at 1565 (noting that "significant efforts were made to notify inmates that their telephone calls (other than to their lawyers) would be monitored, including signs in both English and Spanish to this effect which were posted within four to six inches of each phone"). Thus, no court of appeals has ever applied the "ordinary course" exception in a situation where at least one participant in an intercepted conversation had not received some notice of the possibility of the conversation being recorded.

60
Indeed, in a case decided after the District Court's ruling, the Sixth Circuit, in a 2-1 decision, expressly held that some notice was required. See Adams v. City of Battle Creek, 250 F.3d 980, 984 (6th Cir.), ("`Ordinary course of business' is not defined in the statute, but it generally requires that the use be (1) for a legitimate business [or law enforcement] purpose, (2) routine and (3) with notice."), pet. for reh'g en banc denied, (6th Cir.2001). The dissent argued that if notice sufficed to show implied consent under 18 U.S.C. § 2511(2)(c) and it was required also for the "ordinary course" exception of 18 U.S.C. § 2510(5)(a), then the "exception" was superfluous. See Adams, 250 F.3d at 992 (Krupansky, J., concurring in part and dissenting in part). In response, the majority indicated that notice short of that required to find implied consent would satisfy the "ordinary course" exception; if so, the "ordinary course" exception would not be superfluous. See id. at 984 ("Although we do not find that the statute requires actual consent for the exception to apply, we do hold that monitoring in the ordinary course of business [or law enforcement] requires notice to the person or persons being monitored." (emphasis added)).

61
We agree with the District Court and the Sixth Circuit that notice sufficient to support a finding of implied consent under 18 U.S.C. § 2511(2)(c) is not required for a recording to fall within Title III's "ordinary course" exception. We need not decide in this case, however, whether no notice at all is required (as the District Court held) or if some notice short of that necessary to find implied consent is required (as the Sixth Circuit held) for a recording to fall within the "ordinary course" exception. Assuming arguendo that some notice is required, we hold that the notice that Kenneth Friedman did receive — i.e., notice that "a reasonable person could understand ... to mean that ... calls [other than those to attorneys] would be subject to interception," Friedman, 1996 WL 612456, at *19 — was sufficient for the application of the "ordinary course" exception. We note that Kenneth used cryptic language, evincing his understanding of the possibility that the calls would be monitored or taped. Because, as the District Court found, the recording of the jail-cell calls was also "motivated by legitimate ... law enforcement motives" and "routine," id. at *21, the recordings did not violate Title III.

62
The notice that Kenneth received is also sufficient to dispose of the Friedmans' Fourth Amendment claims related to the tapes, as he had no reasonable expectation of privacy under the circumstances. As we stated in Willoughby, "[a]lthough pretrial detainees may have some residual privacy interests that are protected by the Fourth Amendment, the maintenance of prison security and the preservation of institutional order and discipline are `essential goals that may require limitation or retraction of the retained constitutional rights of both convicted prisoners and pretrial detainees.'" 860 F.2d at 21 (quoting Bell v. Wolfish, 441 U.S. 520, 546, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979)). Accordingly, where a facility provides some notice to inmates that calls may be monitored, the facility's "practice of automatically taping and randomly monitoring telephone calls of inmates in the interest of institutional security is not an unreasonable invasion of the privacy rights of pretrial detainees" or of "noninmates" who receive calls from pretrial detainees. Id. at 21-22; see also Amen, 831 F.2d at 379-80 (holding that routine monitoring and recording of the calls of convicted prisoners does not violate the prisoners' Fourth Amendment rights).

63
B. Rodriguez's Challenges to His Convictions Related to the California Crimes

64
Rodriguez challenges his convictions related to the California crimes on four interrelated grounds. First, he contends that the Government did not present evidence sufficient to support his convictions. Second, he contends that Hernandez's testimony that Kenneth told Hernandez that Gary told Kenneth that Gary would contact "Carlos" to arrange for replacement guns following their arrest in California was improperly admitted hearsay. Third, he contends that certain aspects of the prosecutor's rebuttal argument were improper and deprived him of a fair trial. Finally, he claims that the counts related to the California crimes were improperly joined with the counts related to his crimes in New York (the convictions for which he does not challenge on appeal, see n. 1, ante). We agree with Rodriguez that there was insufficient evidence to support his convictions for the California crimes. Accordingly, we do not reach his remaining arguments.

65
In challenging on appeal the sufficiency of the evidence against him, Rodriguez bears a "heavy burden." See, e.g., United States v. Martinez, 54 F.3d 1040, 1042 (2d Cir.1995); United States v. Sureff, 15 F.3d 225, 228 (2d Cir.1994); see also Jackson v. Virginia, 443 U.S. 307, 318, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). In evaluating such claims, we view the evidence in the light most favorable to the Government, drawing all permissible inferences in the government's favor. Jackson, 443 U.S. at 318-19, 99 S.Ct. 2781; United States v. McDermott, 245 F.3d 133, 136 (2d Cir.2001). To prevail, Rodriguez must establish that no rational trier of fact could have found beyond a reasonable doubt the essential elements of the crime charged. See Jackson, 443 U.S. at 319, 99 S.Ct. 2781; McDermott, 245 F.3d at 136-37.

66
We are mindful that a jury's verdict "may be based entirely on circumstantial evidence" and that the Government's case need not refute every possible hypothesis supporting a defendant's innocence. Martinez, 54 F.3d at 1043. Nevertheless, where the Government seeks to prove a fact that is also an element of the offense by circumstantial evidence, "[w]e must ... be satisfied that the inferences are sufficiently supported to permit a rational juror to find that the element, like all elements, is established beyond a reasonable doubt." Id.

67
Charges of both conspiracy and "aiding and abetting" require the Government to prove, beyond a reasonable doubt, that the defendant knew the specific nature of the conspiracy or underlying crime. See, e.g., United States v. Samaria, 239 F.3d 228, 235 (2d Cir.2001) (conspiracy); United States v. Labat, 905 F.2d 18, 23 (2d Cir.1990) (aiding and abetting). Proof that the defendant knew that some crime would be committed is not enough. See United States v. Pipola, 83 F.3d 556, 562 (2d Cir.1996). Rodriguez argues that the evidence was insufficient for a reasonable jury to conclude beyond a reasonable doubt that he had specific knowledge of the plan to extort Kovach.

68
In United States v. Samaria, we reversed a defendant's convictions for aiding and abetting credit card fraud and for conspiracy to possess stolen property and to commit credit card fraud on the ground that the Government had failed to adduce sufficient evidence of the defendant's knowledge of the fraud. The case involved a scheme by which two individuals, Lance Samaria and Eric Glover, stole credit card numbers, rented public mailboxes, contracted for voice mail accounts, procured false drivers' licenses, and then used the stolen credit card information to order computer and electronics equipment for delivery to the mailboxes. 239 F.3d at 232. On two occasions, United States Secret Service agents observed a car, carrying Samaria, Glover, and co-defendant-appellant Frank Elaiho, and rented to Elaiho, pull up to a rented mailbox location; the men were then observed putting large boxes into the car. Id. All three were charged with conspiracy to receive or possess stolen property and to commit credit card fraud, as well as the substantive crimes of credit card fraud and aiding and abetting credit card fraud. Id. at 233. Samaria and Glover pleaded guilty; Elaiho went to trial, contending that he was merely performing his job as a gypsy cab driver. Id. At trial, Elaiho was convicted of all counts. Id.

69
On appeal, the Government responded to Elaiho's sufficiency-of-the-evidence challenge by pointing to the following:

70
• evidence that Elaiho had made false exculpatory statements when he was arrested;

71
• evidence that Elaiho had observed the stolen goods;

72
• evidence that Elaiho had served as "lookout" during one pick-up by "looking around";

73
• evidence that Elaiho "consciously avoided" discovery of the nature of the conspiracy;

74
• evidence that Elaiho "constructively possessed" the stolen goods; and

75
• evidence that, at one pick-up, Elaiho was the passenger in his car while one of the other defendants drove.

76
Id. at 236.

77
The Samaria panel rejected the Government's arguments, holding that: (1) although the false exculpatory statements supported a finding that Elaiho made them "in an attempt to exculpate himself from involvement in criminality," they did not "by themselves supply the evidence of Elaiho's knowledge and specific intent otherwise lacking from the government's case"; (2) evidence that Elaiho aided in the pickup of the goods could not support knowledge of the conspiracy or the crime without proof that Elaiho knew that the goods were, in fact, stolen, noting "[e]ven if Elaiho suspected that Samaria and Glover were involved in a criminal enterprise of some sort, the exterior appearance of the boxes was equally consistent with any number of different criminal offenses including the receipt and possession of drugs, illegal weapons, counterfeit currency, or the receipt of legal goods such as drug paraphernalia that would later be employed in a criminal endeavor"; (3) the evidence that Elaiho acted as a lookout was very thin, and was "insufficient to demonstrate that Elaiho had the requisite knowledge and specific intent for the crimes charged"; and (4) the evidence that Elaiho rode as a passenger during one of the pick-ups and was present at both pick-ups,

78
may help establish that Elaiho had a closer association with Glover and Samaria than that of a taxi driver, and may, in conjunction with the evidence of Elaiho's false exculpatory statements, observation of the goods, and service as a "lookout," support an inference that Elaiho knew that Glover and Samaria were engaged in some sort of criminal enterprise. Together, this evidence offers us no indicia, however, that Elaiho was aware of the specific crimes charged and that Elaiho had the specific intent to participate in those crimes.

79
Id. at 236-38. We went on to hold that Elaiho was not in constructive possession of the stolen goods as a matter of law, and that, "although conscious avoidance may be a substitute for knowledge, it cannot substitute for the intent necessary to prove the crimes charged." Id. at 238.

80
In this case, as in Samaria, the Government seeks to meet its burden of proving that the defendant knew the specific nature of the conspiracy or underlying crime through circumstantial evidence. Specifically, the Government points to:

81
• a record of a forty-three-minute phone call from Gus Malave's house to Rodriguez's house placed on September 6, 1994 (no evidence was presented of the substance of or participants in the call) and of two similar calls of under two minutes on September 13 and 14, 1994;

82
• records of calls from Malave's house to the beeper number of Edwin Torres, or "Q," an associate of both Rodriguez and Kenneth Friedman, placed between September 6 and 23, 1994;

83
• a record of a Western Union wire transfer sent from "Tracey Stewart" to Gus Malave on September 23, 1994 (the same day that the Friedmans and Hernandez traveled to California) coupled with evidence that Tracey Stewart was an approved visitor for Rodriguez at the detention facility where he was being held during the trial and that the address listed for Stewart was that of Rodriguez's business;

84
• testimony that Rodriguez and Malave were childhood neighbors;

85
• testimony by Hernandez that Gary Friedman purportedly arranged for Rodriguez to wire $3,000 to Malave in California to buy guns and a car (the first set);

86
• testimony by Hernandez that Gary Friedman "called [Rodriguez], told [Rodriguez] to find [Malave,] that we needed more guns, that we had got arrested but we was going to finish it. So then we got in contact with [Malave] again." This testimony was in stark contrast to Hernandez's earlier statements to investigators in proffer sessions, where he said that Kenneth had arranged for the second set of guns directly with Malave and that Bloomgarden had provided the funds.

87
The Government also relies heavily on Malave's actions in furtherance of the California extortion plot, arguing that they support an inference that Rodriguez knew the specifics of the plot because otherwise Malave would not have participated.

88
Although this evidence is plainly sufficient to support a finding that Rodriguez asked Malave to meet the Friedmans and Hernandez with a car and guns upon their arrival in California, and is also arguably sufficient to establish that Rodriguez contacted Malave about the second car and set of guns, none of the evidence demonstrates that Rodriguez knew the purpose for which the Friedmans wanted the cars and guns. As we stated in Samaria, "[c]ircumstantial evidence of knowledge and specific intent sufficient to sustain a conviction must include some indicia of the specific elements of the underlying crime," such as "proof of a defendant's knowledge or intent through evidence that the defendant participated in conversations directly related to the substance of the conspiracy," "possess[ion of] or mention[] in documents important to the conspiracy," "proof that a defendant exercised authority within the conspiracy itself," "recei[pt of] a share of the profits from the conspiracy," or a defendant's statements "explicitly confirm[ing] the nature of the activity in which the co-conspirators were engaged." 239 F.3d at 235-36. None of these "indicia of the specific elements of the underlying crime" are present here. Rather, the evidence merely establishes that Rodriguez "associat[ed] with conspirators" under "suspicious circumstances," see United States v. Salameh, 152 F.3d 88, 151 (2d Cir.1998), and suspected (or should have suspected) "that [a crime] might occur," see Pipola, 83 F.3d at 562.

89
Because Rodriguez has demonstrated that the evidence in the record, viewed in the light most favorable to the Government, is not sufficient to show that he knew the specific nature of the conspiracy or underlying crime, he has met the "heavy burden" faced by defendants seeking to overturn a conviction on grounds that the evidence was insufficient. See generally United States v. Marji, 158 F.3d 60, 63 (2d Cir.1998) (discussing the defendant's burden). Accordingly, Rodriguez's convictions for the California crimes — all conspiracy or aiding and abetting convictions — must be reversed. In light of our disposition of Rodriguez's sufficiency claim, it is not necessary for us to address his remaining claims.8

C. The Friedmans' Apprendi Claims

90
As noted above, with respect to the ITAR counts related to the plot to extort Kovach, the indictment charged that the crimes had caused the deaths of Kovach and Gould, but the issue of whether the defendants had murdered Kovach and Gould was not presented to the jury. The Friedmans argue that, under Apprendi v. New Jersey, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), their life sentences must be vacated because the fact of the murders was an element of the crime.

91
In Apprendi, the Supreme Court held that, "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." 530 U.S. at 490, 120 S.Ct. 2348. In our unanimous en banc opinion in United States v. Thomas, 274 F.3d 655 (2d Cir. 2001), we held, following Apprendi's teachings, that if, in a crime charged pursuant to 21 U.S.C. § 841, the type and quantity of drugs involved may be used to impose a sentence above the statutory maximum for an indeterminate quantity of drugs, then the type and quantity of drugs is an element of the § 841 offense that must be charged in the indictment and submitted to the jury. 274 F.3d at 660, 663.

92
Applying these principles to this case, we observe that, pursuant to 18 U.S.C. § 1952, an ITAR crime of violence that does not result in death carries a maximum penalty of imprisonment for a term of twenty years, while an ITAR crime of violence that results in death is punishable by a sentence up to and including a term of imprisonment for life. See 18 U.S.C. § 1952(a)(3)(B). Thus, the death of a victim of an ITAR crime is a fact that may result in a sentence above the otherwise applicable statutory maximum. We hold, therefore, that the death of a victim of an ITAR crime is an element of the offense that must be charged in the indictment and proven to the jury beyond a reasonable doubt before a sentence above twenty years may be imposed. Cf. Thomas, 274 F.3d at 663 (holding that drug quantity is an element of an offense under 21 U.S.C. § 841). Because the deaths of Kovach and Gould were not submitted to the jury, it was error for the District Court to sentence the Friedmans to life terms on the ITAR counts.

93
We assume, arguendo, that Gary Friedman's request to charge the jury with determining whether the plot involved a plan to commit a "crime of violence" was sufficient to preserve the issue of the failure to charge the jury with determining whether the deaths of Kovach and Gould were caused by the "crime of violence,"9 and, accordingly, review the claim for harmless error pursuant to Fed. R.Crim.P. 52(a).10 See Neder v. United States, 527 U.S. 1, 10-11, 119 S.Ct. 1827, 144 L.Ed.2d 35 (1999) (holding that the omission of an element from the jury charge is subject to harmless-error review); see also United States v. Guevara, 298 F.3d 124 (2d Cir.2002), available at http://laws.findlaw.com/2nd/001133v2.html. In undertaking a harmless-error analysis, we must determine "whether it appears `beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.'" Id. at 15, 119 S.Ct. 1827 (quoting Chapman v. California, 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967)).

94
At trial, the Government introduced detailed testimony from Hernandez about the California crimes, including the murders of Kovach and Gould. This testimony conclusively established that the deaths of Kovach and Gould resulted from the extortion of them (a "crime of violence," see 18 U.S.C. § 16)11 by, inter alia, the Friedmans. The Friedmans did not argue at trial — and do not argue here — that Kovach and Gould's deaths did not result from their extortion. Instead, they argued that the Government had failed to prove their involvement in the extortion plot beyond a reasonable doubt, and, in the case of Gary, that he personally was not involved in the murders. Gary's argument with respect to personal involvement, however, is irrelevant inasmuch as the statute merely requires that the Government prove that the deaths resulted from a "crime of violence," and not that the defendants personally participated in committing murder.

95
On the evidence of record, no reasonable jury could have found the Friedmans guilty beyond a reasonable doubt of the ITAR crimes — as the jury in this case did — and simultaneously found that the Friedmans were not responsible for the deaths of Kovach and Gould. Accordingly, we conclude — in the phrase of the Supreme Court, "beyond a reasonable doubt," Neder, 527 U.S. at 17, 119 S.Ct. 1827 — "that the omitted element was uncontested and supported by overwhelming evidence, such that the jury verdict would have been the same absent the error." Cf. id. Accordingly, the failure to charge the jury on the issue of whether deaths of Kovach and Gould resulted from their extortion was harmless. See id.

96
Gary Friedman also asserts an Apprendi claim related to his conviction for narcotics conspiracy. Because we have held that there is no basis to disturb his life sentence on the ITAR counts, however, his Apprendi claim related to his conviction for narcotics conspiracy is foreclosed by United States v. Rivera, 282 F.3d 74, 76-77 (2d Cir.2000) (holding that an Apprendi error was harmless where the defendant received a concurrent sentence on another count longer than the "statutory maximum" applicable to the count affected by the error).

III. CONCLUSION
In sum, we hold that:

97
(1) We assume without deciding that, in order for a recording to fall within the exception in Title III of the Omnibus Crime Control and Safe Streets Act of 1968 for interceptions using telephone equipment in the "ordinary course" of a law enforcement officer's duties, some notice (in addition to other indicia that the recordings were in the ordinary course) to those being monitored and recorded is required. Nevertheless, the notice received by Kenneth Friedman that telephone calls from the Torrance County Jail were monitored and recorded — that is, notice that a reasonable person could understand to mean that his communications would be subject to interception — was sufficient to support a finding that the recordings of his calls introduced at trial fell within Title III's "ordinary course" exception, and, thus, were not obtained in violation of Title III;

98
(2) In the circumstances of this case, Kenneth and Gary Friedman had no reasonable expectation of privacy in Kenneth's calls to Gary from the Torrance County Jail;

99
(3) Carlos Rodriguez's convictions related to the California crimes were not supported by sufficient evidence that he knew the specific nature of the conspiracy or underlying crime;

100
(4) Because the fact of a victim's death resulting from an ITAR "crime of violence" may be used to impose a sentence greater than the otherwise-applicable statutory maximum, a victim's death is an element of the offense that must be charged in the indictment and proved to a jury beyond a reasonable doubt; and

101
(5) In this case, the failure to charge the jury with the issue of whether the deaths of Kovach and Gould were caused by the extortion of them by the Friedmans was harmless.

102
Accordingly, we reverse Rodriguez's convictions on Counts 14, 15, 16, 17, and 18; we modify the judgment to reduce Rodriguez's consecutive term of imprisonment on Count 23 from 240 months to 60 months (Rodriguez's convictions on counts 19, 20, and 22, for which he was sentenced to concurrent terms of imprisonment for 87 months, are not at issue in the appeal, see n. 1, ante); and we otherwise affirm the judgments of the District Court.

Notes:

*
The Honorable Loretta A. Preska, United States District Judge for the Southern District of New York, sitting by designation

1
Rodriguez does not challenge his convictions related to the extortion of Bruce Wolosky (Counts 19, 20, 22, and 23), a man to whom Rodriguez lent $10,000 at Gary Friedman's request. When Wolosky did not repay the loan, Gary Friedman and Rodriguez used violence and threats of violence to pressure Wolosky to pay. Rodriguez was sentenced to,inter alia, concurrent terms of imprisonment for 87 months on Counts 19, 20 and 22, and a consecutive term of imprisonment for 240 months on Count 23, the weapons charge.

2
Kenneth Friedman contends that the traffic stop and his arrest violated his right pursuant to the Fourth Amendment of the United States Constitution to be free from unreasonable searches and seizures. We dispose of this claim in the summary order issued simultaneously with this opinion

3
Title 18, section 1952 of the United States Code provides, in relevant part:
(a) Whoever travels in interstate or foreign commerce or uses the mail or any facility in interstate or foreign commerce, with intent to —
(1) distribute the proceeds of any unlawful activity; or
(2) commit any crime of violence to further any unlawful activity; or
(3) otherwise promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful activity,
and thereafter performs or attempts to perform —
(A) an act described in paragraph (1) or (3) shall be fined under this title, imprisoned not more than 5 years, or both; or
(B) an act described in paragraph (2) shall be fined under this title, imprisoned for not more than 20 years, or both, and if death results shall be imprisoned for any term of years or for life.
(b) As used in this section (i) "unlawful activity" means ... (2) extortion, bribery, or arson in violation of the laws of the State in which committed or of the United States....

4
With respect to Rodriguez, the District Court used the death in calculating the sentence, but departed downward to 168 months on these counts

5
Title 18, section 16 of the United States Code provides:
The term "crime of violence" means —
(a) an offense that has as an element the use, attempted use, or threatened use of physical force against the person or property of another, or
(b) any other offense that is a felony and that, by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense.

6
Title 18, section 2515 of the United States Code provides:
Whenever any wire or oral communication has been intercepted, no part of the contents of such communication and no evidence derived therefrom may be received in evidence in any trial, hearing, or other proceeding in or before any court, grand jury, department, officer, agency, regulatory body, legislative committee, or other authority of the United States, a State, or a political subdivision thereof if the disclosure of that information would be in violation of this chapter.

7
We note that this opinion is erroneously dated "August 13, 1996" in Westlaw's database

8
As noted above, Rodriguez does not challenge his convictions related to the extortion of Bruce Wolosky, for which he was sentenced to,inter alia, concurrent terms of imprisonment for 87 months on Counts 19, 20 and 22, and a consecutive term of imprisonment for 240 months on Count 23, a weapons charge. Because we reverse Rodriguez's conviction on the weapons charge related to the California crimes, however, we also modify the judgment to reduce Rodriguez's consecutive term of imprisonment on Count 23 to 60 months. See 18 U.S.C. § 924(c)(1) (1996) (prescribing a five-year (60-month) term of imprisonment for a first conviction, a twenty-year (240-month) term of imprisonment for a second or subsequent conviction), amended by Pub.L. No. 105-386, § 1(a)(1), 112 Stat. 3469 (1998).

9
Gary Friedman argues on appeal that this request encompassed the issue of whether the deaths of Kovach and Gould were caused by the "crime of violence." We note, however, that the judge did instruct the jury, in accordance with Friedman's request, that among the elements the Government had to prove was whether Friedman had the intent to commit a "crime of violence" when he traveled (or aided and abetted others in traveling) from New York to CaliforniaSee Trial Tr. at 3092-3118. The record is devoid of any indication that Gary Friedman objected to this portion of the charge on the ground that it did not also direct the jury to determine whether the deaths of Kovach and Gould were caused by that "crime of violence" or on any other ground. See id. at 3059-61, 3091-92, 3124-25 (sidebar opportunities for counsel to object to the charge).

10
Rule 52(a) provides that "[a]ny error, defect, irregularity or variance which does not affect substantial rights shall be disregarded."

11
See n. 5, ante.