**UNITED STATES of America,**

v.

**Joshua G. STEGEMANN, Defendant.**

**No. 1:13–cr–357 (GLS).**

United States District Court,
N.D. New York.

Signed July 29, 2014.

Richard S. Hartunian, United States Attorney, Albany, NY, Richard D. Belliss, Gwendolyn E. Carroll, Assistant U.S. Attorneys, for the Defendant.

Joshua G. Stegemann, Warren County Correctional Facility, Lake George, NY, pro se.

Office of Elizabeth J. Quigley, Elizabeth J. Quigley, Esq., Pittsfield, MA, for the Defendant.

## MEMORANDUM–DECISION AND ORDER

GARY L. SHARPE, Chief Judge.

### I. Introduction

Defendant Joshua G. Stegemann has been charged, in a three-count indictment, with possession with intent to distribute controlled substances, *see* 21 U.S.C. § 841(a)(1), possession of firearms in furtherance of a drug trafficking crime, *see* 18 U.S.C. § 924(c)(1)(A), and possession of firearms and ammunition by a prohibited person, *see id.* § 922(g)(1). (Dkt. No. 10.) Pending are Stegemann's motions for: a discovery order, (Dkt. No. 18); a *Franks*[1] hearing, (Dkt. No. 32, Attach. 2; Dkt. No. 37); suppression of evidence, (Dkt. No. 32, Attachs. 1, 4, 5, 6[2]; Dkt. No. 37; Dkt. No. 44; Dkt. No. 55), and dismissal of count two of the indictment, (Dkt. No. 32, Attach. 3). For the reasons that follow, an evidentiary hearing is necessary on at least one narrow issue involving the sup-

---

1. *See Franks v. Delaware,* 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978).

2. Stegemann filed a duplicative motion seeking suppression of evidence derived from wiretaps and aerial surveillance. (*Compare* Dkt. No. 32, Attach. 6, *with* Dkt. No. 33.) The later-filed motion is denied as redundant.

pression of certain telephone calls, and their derivative use, intercepted while Stegemann was incarcerated in Rensselaer County Jail. To the extent that Stegemann's motions do not rely on the issue to be examined at the hearing or other unresolved issues, as noted below, they are denied.

## II. *Facts*

The relevant facts are predicated on the court's evaluation of the following: the applicable burden of proof, *see United States v. Miller*, 382 F.Supp.2d 350, 361–62 (N.D.N.Y.2005); the affidavits of record, (Dkt. No. 32, Attach. 1 at 4; Dkt. No. 47, Attachs. 1–4), including those of Stegemann, (Dkt. No. 32, Attach. 1 at 5–6; Dkt. No. 32, Attach. 7; Dkt. No. 37, Attach. 43; Dkt. No. 54 at 11–15); the various exhibits in the record, (*see, e.g.,* Dkt. No. 37, Attachs. 1–45; Dkt. No. 47, Attachs. 5–22); and the parties' submissions, (Dkt. No. 32, Attachs. 1–6; Dkt. No. 37; Dkt. No. 44; Dkt. No. 47; Dkt. No. 54; Dkt. No. 55; Dkt. No. 56; Dkt. No. 59). *See* Fed. R.Crim.P. 12(d). While the court is unable to readily resolve disputed issues of fact in the absence of an evidentiary hearing, generally speaking, the unsupported, speculative, self-serving, and conclusory assertions related through Stegemann's affidavits are discredited. *See United States v. Martinez,* 992 F.Supp.2d 322, 326 (S.D.N.Y.2014) ("[W]hen the allegations contained in ... an affidavit [filed in support of a motion to suppress] are general and conclusory, an evidentiary hearing is unnecessary." (internal quotation marks and citations omitted)).

At the outset, it is noted that Stegemann is intimately familiar with the criminal justice system. In fact, he has previously been convicted of multiple drug-related offenses in the state of Massachusetts. (Dkt. No. 47, Attach. 5.) As the investigation that led to the pending charges re-vealed, Stegemann has developed counter-surveillance methods to avoid detection by police, including the short-term use of multiple cellular telephones, each of which he uses for only a brief period of time, and use of several different automobiles. (*See, e.g.,* Original Application ¶ 51, Dkt. No. 37, Attach. 2.) For this reason, it was "imperative [for police] to monitor the oral communications of a member within the inner circle of Stegemann's drug dealing network," which "would reveal the phone numbers utilized by Stegemann at all times." (*Id.*)

The investigation that led to Stegemann's arrest begins with James Cantarella (hereinafter "J. Cantarella"). As of May 2012, police had collected evidence that gave them reason to believe that J. Cantarella was a member of a large narcotics trafficking conspiracy. (Scott Aff. ¶ 6, Dkt. No. 47, Attach. 1.) In particular, police believed that J. Cantarella was a mid-level drug dealer, who depended on large-scale dealers to meet his supply needs. (*Id.*) On March 12, 2013, Massachusetts State Trooper William Scott and City of Pittsfield, Massachusetts, Police Department Investigator Tyrone Price, both members of the Berkshire County Drug Task Force (BCDTF), based out of Berkshire County, Massachusetts, applied for a wiretap warrant under Massachusetts General Laws Chapter 272, § 99 to intercept oral communications over two cellular telephones used by J. Cantarella with telephone numbers 413–441–8174 and 413–770–6568. (*Id.* ¶¶ 1, 9; Original Application ¶¶ 1, 7–8.) As recited in the original wiretap application, "[t]he ultimate goal of th[e] investigation w[as] to reveal the scope of the [drug distribution] conspiracy including the source of supply as well as the subordinates and customers to this organization." (Original Application ¶ 1.) It was further asserted by Trooper Scott

and Investigator Price that there was probable cause to believe that Stegemann was "a source of supply" to J. Cantarella. (*Id.* ¶ 2.) Several other individuals, including Matthieu Cantarella (hereinafter "M. Cantarella"), J. Cantarella's brother, were believed to be involved in the drug trafficking conspiracy. (*Id.* ¶¶ 23, 43(D).) Massachusetts Superior Court Justice John Agostini issued a wiretap warrant for J. Cantarella's 8174 and 6568 telephone numbers the same day that the application for it was filed. (Dkt. No. 37, Attach. 1 at 16–22.)

Following Justice Agostini's approval of the request to tap J. Cantarella's target telephones 8174 and 6568, members of BCDTF began intercepting his communications over those numbers. (Addendum A ¶¶ 25–30, Dkt. No. 37, Attach. 16 at 18–62.) Among other things, members of BCDTF intercepted communications between J. Cantarella and Dennis Hall wherein the two planned a robbery. (*Id.* ¶ 30.) On March 16, 2013, officers arrested J. Cantarella and Hall at the location where they planned to carry out the robbery they discussed over one of the target telephones. (*Id.* ¶¶ 31–34.) Each of the men had a cellular telephone in his possession at the time of the arrest. (*Id.* ¶ 35.) In Addendum A, a follow-up application presented to Justice Agostini, dated March 17, 2013, Trooper Scott and Investigator Price requested two search warrants authorizing them to search the seized telephones, and Justice Agostini issued warrants authorizing them to do so. (*Id.* ¶ 39; Dkt. No. 37, Attach. 16 at 2, 14.)

At some point prior to March 2013, members of BCDTF advised members of the Rensselaer County Drug Task Force (RCDTF), a sister task force in Rensselaer County, New York, that they believed that Stegemann was trafficking narcotics in and around Berkshire County, Massachusetts, and that they also believed that his Stephentown, New York, residence, located at 138 Losty Road, was the base of his illegal operation. (Scott Aff. ¶¶ 4, 14.) The exchange of such information is customary and routine generally where narcotics trafficking investigations are concerned, but, in particular, BCDTF and RCDTF "frequently coordinate" given each's close proximity to the New York–Massachusetts border. (*Id.* ¶ 4; Hyde Aff. ¶ 4, Dkt. No. 47, Attach. 2.) In connection with the information provided by BCDTF, RCDTF conducted aerial surveillance of Stegemann on five separate occasions yielding high definition video images and thermal/infrared images. (Hyde Aff. ¶ 10; Dkt. No. 47, Attach. 20.)

As detailed below, over the course of the investigation, several new applications were made for wiretap and search warrants, yielding further evidence of the drug trafficking conspiracy, and, in particular, Stegemann's role therein. Ultimately, in the early morning hours of April 30, 2013, law enforcement executed a search warrant for 138 Losty Road; upon their arrival, Stegemann fled from the residence. (Hyde Aff. ¶ 16.)

During the execution of the search warrant, police literally and figuratively unearthed a treasure trove of contraband. While allegedly conducting a line search beginning in the area where Stegemann was apprehended after he fled—"clearly" outside of the parameters of his residence and on property belonging to his grandparents, the Foodys—a narcotics—detecting K–9 alerted to a rock pile on the Foody property. (Hyde Aff. ¶¶ 16, 17; Stegemann Aff. 2 ¶ 16, Dkt. No. 37, Attach. 43; Dkt. No. 47, Attach. 12.) Ultimately, illegal narcotics were discovered in that location. (Hyde Aff. ¶ 18.) From another rock pile, some forty yards away, but still on Foody property, police found a loaded

and stolen Ruger 9mm pistol and ammunition. (*Id.;* Dkt. No. 47, Attach. 11) Within the borders of the 138 Losty Road property, officers seized additional illegal drugs, a large sum of suspected drug money, a loaded Smith & Wesson revolver and ammunition, and four envelopes with $5,000 cash in each. (Hyde Aff. ¶ 19; Dkt. No. 47, Attachs. 8–10.) In addition, inside of Stegemann's residence, police found an envelope "that appeared to contain three account numbers owned by [Stegemann] at Greylock Federal Credit Union." (Scott Aff. ¶ 24.)

Stegemann was arrested and thereafter "charged with various narcotics and firearm charges in Rensselaer County Court." (Hyde Aff.¶ 24.) While detained in the Rensselaer County Jail, Stegemann placed two calls from the booking area telephone, one to his mother and the other to his uncle. (Addendum N ¶¶ 20–21, Dkt. No. 37, Attach. 40 at 10–19.) No signs or warnings, written or audible, indicated that the telephone was monitored, (Ryan Aff. ¶ 4), and Stegemann claims that Rensselaer County Sheriff's Sergeant Scott Ryan told him that the telephone was not monitored, (Stegemann Aff. 1 ¶ 112, Dkt. No. 32, Attach. 7), although that fact is disputed by Sgt. Ryan, (Ryan Aff. ¶ 5, Dkt. No. 47, Attach. 4). In sum and substance, Stegemann requested that his mother and uncle bail him out of jail during the calls. (Addendum N ¶¶ 20, 21.) Following those conversations, which were, in fact, recorded, police met with Stegemann's mother. (*Id.* ¶¶ 22–23; Scott Aff. ¶ 25.) She told an officer that Stegemann stored a safe in the attic of her daughter, who is also Stegemann's sister. (Addendum N ¶ 23(C).)

Stegemann's sister thereafter relinquished the safe to police. (*Id.* ¶ 24.) A search of the safe, following issuance of a warrant, revealed that it contained $160,000 in U.S. currency. (Scott Aff. ¶ 27; Dkt. No. 47, Attach. 14.)

Throughout the course of this investigation, Trooper Scott and Investigator Price prepared affidavits in support of applications seeking permission to intercept oral communications over various telephones, and additional search warrants. As reflected in the record, Justice Agostini granted the following applications, which authorized the interception of eight Stegemann target cellular telephones [3]:

*Addendum B (March 20, 2013):* extension of authority to intercept J. Cantarella's 8174 number for fifteen additional days; authorization to intercept M. Cantarella's 413–449–4064 telephone number; and authority to intercept three telephone numbers, 914–327–7010, 860–380–7692, and 347–443–2833, used by Stegemann. (Addendum B ¶ 19, Dkt. No. 37, Attach. 3 at 27–57; Dkt. No. 37, Attach. 3 at 20–26.) Because J. Cantarella's 6568 telephone had been seized, police did not seek to monitor that number any longer. (Addendum B ¶ 19.)

*Addendum C (March 23, 2013):* extension of authority to intercept J. Cantarella's 8174 number for fifteen additional days; authorization to intercept J. Cantarella's 413–449–4142 number; and authority to intercept Stegemann's 347–443–2833 number.[4] (Addendum C ¶ 10, Dkt. No. 37, Attach. 4 at 36–47; Dkt. No. 37, Attach. 4 at 19–25.) Because of inactivity on M. Cantarella's 4064, and

---

**3.** Those eight telephone numbers are: 914–327–7010, 860–380–7692, 347–443–2833, 347–583–9425, 347–920–7516, 203–450–3854, 917–743–9502, and 347–266–8522.

**4.** Although the March 23, 2013 application and order do not label the authorization to intercept communications over Stegeman's 2833 number as an "extension" of the March 20 authorization, the order was an extension in practical terms.

Stegemann's 7010 and 7692 numbers, police did not seek to monitor those numbers any longer. (Addendum C ¶ 10.)

*Addendum D (March 25, 2013):* extension of authority to intercept J. Cantarella's 8174 number for fifteen additional days; extension of authority to intercept J. Cantarella's 4142 number for fifteen additional days; extension of authority to intercept Stegemann's 2833 number for fifteen additional days; and authority to intercept M. Cantarella's 413–449–4179 number. (Addendum D ¶ 10, Dkt. No. 37, Attach. 5 at 39–44; Dkt. No. 37, Attach. 5 at 19–25.)

*Addendum E (March 28, 2013):* extension of authority to intercept J. Cantarella's 4142 number for fifteen additional days; extension of authority to intercept M. Cantarella's 4179 number for fifteen additional days; extension of authority to intercept Stegemann's 2833 number for fifteen additional days; and authority to intercept Gerald Vailes' 646–739–8881 number. (Addendum E ¶ 21, Dkt. No. 37, Attach. 6 at 43–80; Dkt. No. 37, Attach. 6 at 20–27.)

*Addendum F (April 2, 2013 ):* extension of authority to intercept J. Cantarella's 4142 number for fifteen additional days; extension of authority to intercept M. Cantarella's 4179 number for fifteen additional days; extension of authority to intercept Vailes' 8881 number for fifteen additional days; and authority to intercept Stegemann's 347–583–9425 number. (Addendum F ¶ 14, Dkt. No. 37, Attach. 7 at 41–50; Dkt. No. 37, Attach. 7 at 20–27.)

*Addendum G (April 5, 2013):* extension of authority to intercept J. Cantarella's 4142 number for fifteen additional days; extension of authority to intercept Vailes' 8881 number for fifteen additional days; extension of authority to inter-cept Stegemann's 9425 number for fif-teen additional days; and authority to intercept M. Cantarella's 413–449–4356 number. (Addendum G ¶ 19, Dkt. No. 37, Attach. 8 at 39–53; Dkt. No. 37, Attach. 8 at 18–25.)

*Addendum H (April 8, 2013):* authority to intercept Stegemann's 347–920–7516 and 203–450–3854 numbers. (Addendum H ¶ 14, Dkt. No. 37, Attach. 9 at 32–38; Dkt. No. 37, Attach. 9 at 18–24.)

*Addendum I (April 13, 2013):* authority to intercept Stegemann's 917–743–9502 number. (Addendum I ¶ 21, Dkt. No. 37, Attach. 10 at 28–38; Dkt. No. 37, Attach. 10 at 18–24.)

*Addendum J (April 19, 2013):* authority to intercept Stegemann's 347–920–7516, 917–743–9502, and 347–266–8522 num-bers; authority to intercept Vailes' 646–739–8881 number; authority to intercept Andrew Saunders' 413–841–9490; and authority to intercept Delilah Saunders' 718–913–4573 number. (Addendum J ¶ 34, Dkt. No. 37, Attach. 11 at 49–69; Dkt. No. 37 Attach. 11 at 20–27.)

*Addendum L (May 1, 2013):* authority to search and seize three accounts at Greylock Federal Credit Union. (Addendum L ¶ 49, Dkt. No. 38 at 22–89; Dkt. No. 47, Attach. 22.)

*Addendum N (May 3, 2013):* authority to conduct a search of the safe provided to police by Stegemann's sister. (Addendum N ¶ 27; Dkt. No. 37, Attach. 40 at 10–19.)

Each of the affidavits in support of the wiretaps and search warrants incorporated the contents of earlier filed affidavits, and also successively recited new incriminating facts pertaining to the drug conspiracy and Stegemann's role in that conspiracy, all as revealed by the continuing investigation.

Rensselaer County Court Judge Debra Young granted two applications based, in part, upon another addendum:

*Addendum K (April 29, 2013)*[5]: authority to conduct unannounced search of 138 Losty Road; and authority to conduct sub-surface search of 138 Losty Road. (Addendum K ¶ 71, Dkt. No. 37, Attach. 18; Dkt. No. 37, Attach. 19 at 10–11; Dkt. No. 37, Attach. 19 at 19–20.)[6]

Again, the search warrant applications incorporated earlier-filed affidavits. (*See e.g.,* Dkt. No. 47 at 20.)

Other applications were made and granted in the course of the investigation, but, because they are not pertinent to Stegemann or he does not seek any relief with respect to them, discussion of those applications/warrants has been omitted.[7]

## III. *Discussion*

To put it nicely, the motions filed by Stegemann, both *pro se* and through counsel, are a jumbled, overly-lengthy, piecemeal mess. Regretfully, the court graciously permitted Stegemann to file an excessively-long memorandum of law and also accepted *pro se* filings. (Dkt. Nos. 31, 55, 59.) Nonetheless, the court has considered all of the parties' submissions. As explained above, Stegemann moves for: (1) a discovery order, (Dkt. No. 18), a *Franks* hearing, (Dkt. No. 32, Attach. 2; Dkt. No. 37), the suppression of evidence, (Dkt. No. 32, Attachs. 1, 4, 5, 6;

Dkt. No. 37; Dkt. No. 44; Dkt. No. 55), and dismissal of count two of the indictment, (Dkt. No. 32, Attach. 3). While Stegemann filed motions seeking the various relief outlined above, he filed a memorandum of law only in support of his motions to suppress and for a *Franks* hearing. (Dkt. No. 18; Dkt. No. 32, Attachs. 1, 2, 4, 5, 6; Dkt. No. 37.) Where Stegemann's memorandum of law fails to elucidate or otherwise explain a basis for suppression that is mentioned—but not explained—in one of the documents labeled as a motion to suppress, any legal arguments that such non-specific and unexplained assertions suggest are waived.[8] *See Miller,* 382 F.Supp.2d at 364–65.

Before delving into the specifics of each motion, the court takes up a preliminary issue that touches upon several of the specific arguments raised by Stegemann. Throughout his motion papers, Stegemann contends that Massachusetts or New York law controls as to various issues—particularly Massachusetts law with respect to the Massachusetts wiretap warrants. (*See, e.g.,* Dkt. No. 37 at 32–34; Dkt. No. 44 at 6.) As this court has discussed in the past, federal law controls the analysis of issues arising out of state wiretap investigations. *See United States v. Vasconcel-*

---

**5.** Addendum K, dated April 29, 2013, was used as support for two separate search warrant applications made by Rensselaer County Sheriff's Office Investigator, Sergeant Shane Holcomb on April 29 and May 2, respectively. (Dkt. No. 37, Attach. 19 at 2–9, 12–18.)

**6.** The second search warrant pertaining to 138 Losty Road was sought and approved on May 2, 2013. (Dkt. No. 37, Attach. 19 at 12–18; Dkt. No. 37, Attach. 19 at 19–20.)

**7.** Addendums M, P, and Q fall into this category. (Addendum M ¶ 26, Dkt. No. 37, Attach. 12 at 41–66; Dkt. No. 37, Attach. 12 at 20–27; Addendum P ¶ 29, Dkt. No. 37, Attach. 13 at 36–50; Dkt. No. 37, Attach. 13 at

2–8; Addendum Q ¶¶ 37–38, Dkt. No. 37, Attach. 14 at 38–56; Dkt. No. 37, Attach. 14 at 37.)

**8.** For example, Stegemann nominally seeks suppression of evidence derived from aerial surveillance, (Dkt. No. 32, Attach. 6), but then fails to explain a legal or factual basis for suppression in his memorandum of law. Any suppression argument regarding aerial surveillance is therefore waived as insufficiently raised. In any event, even if Stegemann had sufficiently articulated his argument in this regard, the motion would be denied largely for the reasons expressed in the government's papers. (Dkt. No. 47 at 33–39.)

*los,* 658 F.Supp.2d 366, 380–82 (N.D.N.Y. 2009). Accordingly, the arguments based on legal principles other than those rooted in federal law are ignored. It is also beyond dispute that federal law generally governs the review of motions to suppress evidence even where the evidence in question was solely the product of an investigation by state police agencies. *See United States v. Pforzheimer,* 826 F.2d 200, 204 (2d Cir.1987) ("[F]ederal law should apply to ... federal criminal prosecution[s], even though the underlying investigation leading to prosecution was conducted solely by state officials.") Bearing in mind that federal law controls, each of Stegemann's motions are addressed, in turn, below.

## A. *Discovery*

■ Stegemann seeks an order directing the government to produce a slew of materials in discovery. (Dkt. No. 18.) In essence, Stegemann has moved to compel disclosure. While the government disclosed some of the materials targeted by Stegemann prior to the date he filed his motion, (Dkt. No. 27, Attachs. 1, 2), it has since that time disclosed additional, but not all, of the materials sought, (Dkt. No. 27, Attachs. 4, 5). Of the fifteen separate groups of materials requested by Stegemann, the government has provided item numbers one through six, eight through eleven, thirteen, and fifteen. (Dkt. No. 27 ¶ 10; Dkt. No. 27, Attach. 4 at 1; Dkt. No. 27, Attach. 5.) The government agrees to provide item number twelve when it is available, denies the existence of any materials related to item number 14, and—the sticking point here—contends that some of the materials sought in item number seven "are beyond the scope of what is discoverable." (Dkt. No. 27 ¶ 13; Dkt. No. 27, Attach. 4 at 1.)

The seventh item identified by Stegemann in his motion seeks "[p]olice reports detailing the wiretap investigation, flight patterns of Massachusetts State Police aerial surveillance and flight plans of the same, police report detailing authorization for multi-jurisdictional and extra-jurisdictional police investigation, police report detailing initiation of joint investigation." (Dkt. No. 18 ¶ 7.) The government: (1) has provided reports "detailing the investigation"; (2) is unaware of the existence of any "police report[s] detailing authorization for multi-jurisdictional and extra-territorial police investigation, [or] police report[s] detailing initiation of joint-investigation"; and (3) objects, as stated above, to disclosure of "flight patterns of Massachusetts State Police aerial surveillance and flight plans of the same." (Dkt. No. 27 ¶ 13.) The government finally notes that it has disclosed "all aerial surveillance of [Stegemann]'s residence, along with suspected narcotics transactions involving [Stegemann]." (*Id.*)

Not surprisingly, Federal Rules of Criminal Procedure 16(a), Local Rules of Practice, Criminal Procedure Rule 14.1, and the court's pretrial scheduling order do not specifically or implicitly contemplate the disclosure of flight patterns or flight plans relevant to aerial surveillance. While the court is hard-pressed to find any authority that would compel the government's disclosure of what Stegemann seeks in item number seven, Stegemann's motion is denied for a more fundamental reason: the government cannot disclose what it does not have in its possession, custody, or control. Indeed, the government has no obligation to do so, and it has produced all of the evidence in its possession with respect to aerial surveillance of Stegemann. *See* Fed.R.Crim.P. 16(a)(1)(E). Accordingly, the majority of Stegemann's motion is denied as moot, and, with respect to item number seven, it is denied outright.

## B. *Franks Hearing*

 Next, Stegemann seeks a *Franks* hearing with respect to each and every wiretap and search warrant—all told Stegemann identifies four search warrants and twenty [9] wiretap warrants. (Dkt. No. 32, Attach. 2; Dkt. No. 37.) While his arguments are more nuanced, in essence, he claims that the affidavits supporting each of the warrants contain material misrepresentations of fact, which "were either deliberate falsehoods or made with a reckless disregard of the truth," and material omissions of fact, which would have caused an impartial magistrate to find probable cause lacking or decline to issue the warrant sought "for jurisdictional reasons." (Dkt. No. 32, Attach. 2 at 2.) Stegemann submits his own affidavit "to satisfy the preliminary showing standard." (*Id.*; Stegemann Aff. 1.)

Stegemann makes convoluted arguments in support of a *Franks* hearing under the following ten headings in his memorandum of law: (1) "misrepresentation of criminal record and representation as to illegally seized evidence"; (2) "illegal disclosure and use of private and privileged proffer"; (3) "misattribution of phone calls and illegal interception of same"; (4) "failure to disclose to [Justice] Agostini that the Massachusetts law enforcement was investigating extra-territorial crimes was a material omission"; (5) "lack of alternative investigative procedures"; (6) "Losty Road search warrants"; (7) "the search warrants for the safe and bank accounts"; (8) "illegal use of GPS"; (9) "aerial surveillance"; and (10) "listening post." (Dkt. No. 37 at 2–32.) Some of these arguments bleed into others made in support of suppression, which are addressed below. *See*

*infra* Part III.C. In a later-filed memorandum of law, Stegemann parrots some of his original *Franks* arguments and further contends that the failure to disclose a tap on his 646–581–2081 number in any of the applications evinces an intentional omission. (Dkt. No. 44 at 3–5.) Because Stegemann has failed to make a substantial showing that any material misrepresentations or omissions were intentionally made or made with reckless disregard for the truth, his motion for a *Franks* hearing is denied.

 "To secure a *Franks* hearing, a defendant must both (1) make a 'substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit' and (2) show that 'the allegedly false statement [was] necessary to the finding of probable cause.'" *United States v. Morris*, 509 Fed.Appx. 58, 60 (2d Cir.2013) (quoting *Franks v. Delaware*, 438 U.S. 154, 155–56, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978)); *see United States v. Mandell*, 752 F.3d 544, 552 (2d Cir.2014). With respect to the substantial preliminary showing requirement, "the challenger's attack must be more than conclusory and must be supported by more than a mere desire to cross-examine." *Franks*, 438 U.S. at 171, 98 S.Ct. 2674. Indeed, the challenger's moving papers must be "sufficiently definite, specific, detailed, and nonconjectural to enable the court to conclude that contested issues of fact going to the validity of the search are in question." *United States v. Pena*, 961 F.2d 333, 339 (2d Cir.1992) (internal quotation marks and citations omitted). "There is, of course, a presumption of validity with respect to the affidavit

---

**9.** Notably, some of the identified warrants are clearly irrelevant to Stegemann, and some of the applications and warrants are absent from the record before the court. By failing to include and make specific arguments about some of the warrants, Stegemann has waived his right to challenge them. *See Miller,* 382 F.Supp.2d at 364–65.

supporting the ... warrant." *Franks,* 438 U.S. at 171, 98 S.Ct. 2674.

First, it is noteworthy that Stegemann's affidavit and memorandum of law are both filled with rank speculation, some of which is easily refuted by the government's responsive evidence, and reflect a fundamental misunderstanding of the wiretap investigation conducted in this case.[10] In any event, Stegemann's arguments in support of a *Franks* hearing can be placed into a few categories. There are some arguments—regarding criminal history, misattribution of calls,[11] the joint investigation between BCDTF and RCDTF, and the use of aerial surveillance—where he simply fails to satisfy the court that nonconjectural evidence supports his allegations that any intentional or reckless misrepresentations or omissions were made in support of a warrant application. Indeed, the affidavits of Trooper Scott and Sgt. Shane Holcomb unequivocally express that there was no intent on their part as affiants to hide the things about which Stegemann complains or to otherwise misrepresent them. (Scott Aff. ¶¶ 5, 14, 18, 22; Holcomb Aff.

¶¶ 5, 7; Dkt. No. 47, Attach. 3.) Stegemann's innuendo does not compel a *Franks* hearing on those issues.

Other of Stegemann's arguments are factually flawed as demonstrated by affidavits from the government's witnesses. Particularly, Stegemann's contentions that a proffer from an earlier prosecution was impermissibly used against him, his 2081 number was unlawfully tapped without a warrant, his text messages were unlawfully intercepted, the wireroom used in this investigation was located in New York, and GPS was unlawfully used, have been squarely disproved through nonspeculative evidence. (Scott Aff. ¶¶ 18, 19, 20, 30(a), 30(f); Holcomb Aff. ¶ 10(a).) A *Franks* hearing is likewise unjustified as to these issues.

The remaining claims—regarding alternative investigative procedures/necessity of wiretaps, the Losty Road warrants, and the search warrants for the safe and bank accounts—do not implicate a *Franks* hearing either, but require a bit more explanation. Stegemann argues that: (1) police

10. Just as an example of the flawed logic in Stegemann's arguments, the court points to his lengthy explanation that police "blatantly, recklessly, and intentionally misrepresented to the court" how they obtained the 8522 number. (Dkt. No. 37 at 12–13.) Stegemann makes a storm in a teacup about the fact that the single call relied on by police to obtain a tap for the 8522 number must have been fabricated by police because it is not part of the Call Data Listing (CDL) for Stegemann's telephones. (*Id.*) Stegemann's fundamental error is that the CDL relied upon reflects call data for the eight target phones that were associated with Stegemann as they became targets of the investigation. (Dkt. No. 37, Attach. 21.) In order to verify whether the call alleged in Addendum J at paragraph twenty-eight was placed by M. Cantarella to the 8522 Stegemann number, Stegemann would need to review the CDL for M. Cantarella's target numbers. In other words, the CDL upon which Stegemann relies would *not* show the

call recounted in Addendum J because M. Cantarella's phone was the target, and Stegemann's 8522 phone, which was not yet a target phone, was only the recipient of M. Cantarella's call. This is one of a litany of such confounding logical errors in Stegemann's papers, which significantly undermines the credibility of all of Stegemann's legal arguments.

11. Stegemann makes a handful of arguments, including unsupported accusations that police fabricated an informant with respect to the arrest of J. Cantarella and Hall in order to maintain the confidentiality of the wiretap investigations, and that police manufactured facts to cover up unlawful taps of Stegemann's various phones. (Dkt. No. 37 at 3–16.) Other arguments, regarding the failure to disclose the efforts of New York law enforcement to Justice Agostini, are duplicative of contentions raised under their own headings. (*Id.* at 6.)

did not need to resort to wiretaps from the inception of the wiretap investigation, (Dkt. No. 37 at 19–24); (2) Sgt. Holcomb misled Judge Young to believe that he had personal knowledge of the facts alleged in support of the Losty Road search warrant applications,[12] (*id.* at 24–28); and (3) officers misrepresented facts in Addendum N and failed to disclose that Stegemann was told by an officer that his calls from the Rensselaer County Jail would not be recorded, (*id.* at 28). These claims are also flawed for one reason or another.

 First, federal law does not require that *all* other investigative measures, short of wiretapping, must be unsuccessful before a wiretap can be authorized; indeed, "wiretapping is particularly appropriate when the telephone is routinely relied on to conduct the criminal enterprise under investigation." *United States v. Young,* 822 F.2d 1234, 1237 (2d Cir.1987) (internal quotation marks and citation omitted). Moreover, officers are required only to inform the authorizing judge "of the nature and progress of the investigation and of the difficulties inherent in the use of normal law enforcement methods." *United States v. Concepcion,* 579 F.3d 214, 218 (2d Cir.2009) (internal quotation marks and citation omitted). Importantly, the

officer's allegations are entitled to deference. *See Vasconcellos,* 658 F.Supp.2d at 383.

Here, Stegemann's contentions go more to whether there was a sufficient basis for the officer's claims that other investigative techniques would not be successful—an argument more appropriately raised as a pure suppression ground. (Dkt. No. 37 at 19–23.) Only when he repeats earlier arguments—regarding the failure to disclose prior investigative efforts in New York and the unfounded assertion that police previously obtained a warrant for his 2081 telephone—does Stegemann get close to making an argument that could ever implicate *Franks.* (*Id.* at 23–24.) Having already disposed of those arguments above, it is plain to the court that the information provided by officers regarding the necessity of a wiretap warrant was sufficient in any event, and no material misrepresentation or omission was made with respect to same.[13]

Second, as discussed below, officers working on a common investigation are entitled to rely on the information of any fellow officer participant in support of a warrant. *See infra* Part III.C.2.ii. Accordingly, knowledge of the BCDTF regarding Stegemann's activities was imputed to

12. Stegemann's argument with respect to the Losty Road search warrants is more comprehensive than as stated above, (Dkt. No. 37 at 24–28); however, the additional arguments are either subsumed by those that have been addressed previously or are obviously irrelevant.

13. In addition, while Stegemann's argument that Addendum C "contains no [a]lternative [p]rocedures [s]tatement," (Dkt. No. 37 at 22), which is not a *Franks* argument although advanced as such, is correct on its face, because Addendum C attached and incorporated the Original Application, (Addendum C ¶ 5), which provided an ample statement to satisfy 18 U.S.C. § 2518(1)(c), (Original Application ¶¶ 63–69), there is no basis to invali-

date the warrant issued upon the Addendum C application, *see United States v. Steinberg,* 525 F.2d 1126, 1129 (2d Cir.1975) (refusing to suppress fruits of wiretap for noncompliance with 18 U.S.C § 2518(1)(c) where wiretap application incorporated by reference a supporting affidavit that tracked language of § 2518(1)(c)); *see also United States v. Garcia–Villalba,* 585 F.3d 1223, 1232 (9th Cir. 2009) (permitting the incorporation of facts from prior affidavits in support of wiretap warrants to be considered by judge in support of statutory necessity requirement and finding that "such a technique, which is designed merely to save time, not to piggy-back an earlier showing of necessity into a later affidavit" is entirely permissible).

RCDTF, and Stegemann's argument about Sgt. Holcomb's personal knowledge is inapposite.

Finally, with respect to the bank accounts, Stegemann puts the cart before the horse. His contention is that it was a material and intentional or reckless omission to fail to tell Justice Agostini that the information that led police to the safe was derived from the booking area telephone conversations. (Dkt. No. 37 at 28.) Stegemann's argument presupposes that the affiants of Addendum N should have known that the intercepted calls placed from the Rensselaer County Jail were subject to suppression and that their derivative use was similarly impermissible. As such, this argument is more properly considered as an argument for suppression, which is squarely addressed below, *see infra* Part III.C.3, than as an argument for a *Franks* hearing.

For all of these reasons, the court denies Stegemann's motion for a *Franks* hearing. As an alternative ground for denial of the motion, and for the reasons expressed in the government's opposition papers and adopted by the court, the information that Stegemann claims was misrepresented or omitted was not material to the finding of probable cause. (Dkt. No. 47 at 42–46.)

## C. *Suppression*

Stegemann seeks the suppression of evidence collected during the course of the investigation. (Dkt. No. 32, Attachs. 1, 4, 5, 6; Dkt. No. 37; Dkt. No. 44.) His arguments are addressed in the order that he raised them.

### 1. *Bank Accounts*

Stegemann seeks the suppression of evidence seized related to three Greylock

Federal Credit Union bank accounts, including, but not limited to, bank statements and receipts and U.S. currency, and also seeks the return of the seized money. (Dkt. No. 32, Attach. 1.)[14] Stegemann's argument is two-fold. He first alleges that the money was "initially seized without a warrant and without probable cause to believe that [it was] associated with the crimes for which [he] is indicted." (*Id.* at 1–2.) Next, Stegemann claims that the source of the money is "unrelated to the alleged illegal activities which form the basis for the ... indictment." (*Id.*) The court cannot agree that suppression or return is required.

As is addressed below, the April 29, 2013 search warrant for 138 Losty Road was supported by probable cause. *See infra* Part III.C.2. Accordingly, the information obtained when that warrant was executed relevant to the bank accounts—"an envelope ... that appeared to contain three account numbers owned by the defendant at Greylock Federal Credit Union," (Scott Aff. ¶ 24)—was lawfully obtained. In turn, the search warrant authorizing police to seize the Greylock accounts was supported by probable cause. (Addendum L ¶ 49; Dkt. No. 47, Attach. 22.)

Stegemann's attempt to demonstrate that the money seized from his Greylock accounts came from legitimate sources unrelated to any criminality is irrelevant at this juncture. The only means of seeking return of the seized property is Rule 41(g) of the Federal Rules of Criminal Procedure, and that remedy cannot be invoked in this case until the criminal proceedings conclude. *See United States v. Sims,* 376 F.3d 705, 708 (7th Cir.2004). Should Stegemann be found guilty at trial, he will be

---

14. Although he mentions suppression of the evidence related to the bank accounts in the heading in his memorandum of law, Stegem-ann fails to expand upon the arguments he raised in his earlier-filed papers in his memorandum. (Dkt. No. 37 at 89.)

entitled to seek a hearing before the money is forfeited. *See* Fed.R.Crim.P. 32.2(b)(1)(B). The arguments he advances now would be appropriately made at that time should Stegemann be convicted.

### 2. 138 Losty Road Search Warrants

Stegemann argues that the fruits of the two warrants authorizing searches of 138 Losty Road must be suppressed. (Dkt. No. 32, Attach. 4 at 1–2.) He asserts that the searches violated his Fourth and Fourteenth Amendment rights and the corresponding New York and Massachusetts constitutional provisions. (*Id.* at 1.) Stegemann contends that: (1) the April 29 search warrant application, drafted by BCDTF members, was unsworn and based on an unlawful New York investigation, and the New York officer affiant unlawfully swore to facts for which he had no personal knowledge; and (2) in executing the warrant, police exceeded its scope. (Dkt. No. 37 at 71–88.) Suppression is required, according to Stegemann, under both a Fourth Amendment analysis and Federal Rule of Criminal Procedure 41. (*Id.* at 78–81.)

#### i. Support for April 29 Search Warrant

██ Although he describes the affidavit in support of the April 29 search warrant as unsworn,[15] Stegemann actually takes issue with the absence of Sgt. Holcomb's personal knowledge of the facts he recites in the supporting affidavit, which, in turn, impermissibly "piggy backs" on Addendum K. (Dkt. No. 37 at 78–81.) Stegemann's argument is rejected.

██ "[T]he task of a ... court [reviewing a challenged warrant] is simply to

ensure that the 'totality of the circumstances' afforded the magistrate 'a substantial basis' for making the requisite probable cause determination." *United States v. Clark*, 638 F.3d 89, 93 (2d Cir. 2011) (quoting *Illinois v. Gates*, 462 U.S. 213, 238, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983)). Ultimately, " 'the issuing magistrate [or judge] is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, ... there is a fair probability that contraband or evidence of a crime will be found in a particular place.' " *United States v. Falso*, 544 F.3d 110, 117 (2d Cir.2008) (quoting *Gates*, 462 U.S at 238, 103 S.Ct. 2317). Moreover, it is hornbook law that the "[o]bservations of fellow officers of the Government engaged in a common investigation are plainly a reliable basis for a warrant applied for by one of their number." *United States v. Ventresca*, 380 U.S. 102, 111, 85 S.Ct. 741, 13 L.Ed.2d 684 (1965); *see United States v. Tudoran*, 476 F.Supp.2d 205, 213 (N.D.N.Y.2007) ("Under the 'fellow officer' rule, there is a presumption in a joint investigation that knowledge of one officer is attributable to all.").

Here, Judge Young was confronted with Sgt. Holcomb's application, which largely recounted facts sworn to by Trooper Scott and Investigator Price in Addendum K, and other disclosed documents and evidence, which collectively demonstrated that there was probable cause to believe that evidence of criminality would be found at 138 Losty Road. (Dkt. No. 37, Attach. 19 at 2–9.) It is noteworthy that Stegemann does not argue that the facts recounted by Sgt. Holcomb fail to establish probable cause.[16] His argument is a technical

---

**15.** It is beyond dispute that Sgt. Holcomb swore to the facts in the affidavit he submitted in support of the search warrant application as did Trooper Scott and Investigator Price in support of Addendum K. (Dkt. No. 37, Attach.

19 at 7; Addendum K at 99.) Therefore, Stegemann's assertion that Addendum K was unsworn, (Dkt. No. 37 at 79), is erroneous.

**16.** Stegemann's only mention of the failure of probable cause as support for the search and

one: Sgt. Holcomb cannot act as a mouthpiece for the BCDTF where he has no personal knowledge of the facts asserted in Addendum K. (Dkt. No. 37 at 78–81.) Stegemann fails to appreciate, however, that members of RCDTF and BCDTF were engaged in a joint investigation as of March 19, 2013, (Dkt. No. 37, Attach. 19 at 4), and were entitled to rely on the information possessed by any individual officer of either task force as a basis for probable cause, *see Ventresca*, 380 U.S. at 111, 85 S.Ct. 741. In any event, it is plain that Judge Young had a substantial basis for finding probable cause and issuing the warrant.[17]

### ii. Scope of the Search

Stegemann next complains that police exceeded the scope of the April 29 search warrant by conducting a search of the Foody property, which was not permitted by the warrant, and that, as a result, evidence seized from the Foody property must be suppressed. (Dkt. No. 37 at 81–88.) In particular, Stegemann argues that a line search was not warranted, but, even if it was, the police impermissibly conducted a general search of the Foody property that far exceeded the area in which he fled. (*Id.*) Moreover, Stegemann contends that the open fields doctrine is inapplicable because his use and enjoyment of the adjoining Foody property demonstrates that the evidence was seized within the expanded curtilage of his home. (*Id.* at 82–85.) Other than referring to the search following Stegemann's flight from his home as a "line search" in its factual recitation, (Dkt. No. 47 at 21–22), the government fails to address these arguments by way of any Fourth Amendment analysis.

While the court can speculate about the legality of the line search on the Foody property, it may be that disputed issues of fact necessitate an evidentiary hearing as to this argument.[18] Given the lack of clari-

---

wiretapping warrants is a single conclusory statement to that effect contained in his notice of motion. (Dkt. No. 32, Attach. 4 at 1; Dkt. No. 32, Attach. 6 at 3.) In 137 pages of supporting memoranda and forty pages of accompanying affidavits, there is no discussion of probable cause principles nor any discussion of how any of the contested warrants fail to establish probable cause. (Dkt. No. 32, Attach. 7; Dkt. Nos. 37, 44, 54, 55, 59.)

The court is fully conversant with the appropriate standards of review and their application to eavesdropping and search warrants, including the deference afforded to decisions by the issuing judge. *See Vasconcellos*, 658 F.Supp.2d at 383–91; *United States v. O'Brien*, 498 F.Supp.2d 520, 538–39 (N.D.N.Y.2007), *aff'd* 303 Fed.Appx. 948 (2d Cir.2008). Having reviewed all of the pertinent eavesdropping and search affidavits and observing that the cogent facts have been adequately summarized and analyzed by the government, (Dkt. No. 47 at 1–16, 19–27, 30–32, 39–41), the court finds that there is overwhelming factual support demonstrating that probable cause supported the issuance of each warrant. Furthermore, the court adopts

the government's good faith, independent source, and inevitable discovery arguments as further bases for denying the motions to suppress. (*Id.* at 32–33, 37–39, 41–42.)

17. Finding no defect in the warrant itself, there is no basis to suppress under Rule 41, which would require the same as a prerequisite to the test established in *United States v. Burke*, 517 F.2d 377, 386–87 (2d Cir.1975). *See United States v. Pangburn*, 983 F.2d 449, 455 (2d Cir.1993).

18. For example, Stegemann contends that, after his arrest on April 30, he was placed in a Sheriff's vehicle where he "watched the police immediately descend upon the area along the rock wall on the eastern edge of [the Foody] property." (Stegemann Aff. 2 ¶ 35.) Stegemann further explains that an officer approached him and stated, among other things, "we knew it was in the rock wall," (*id.* ¶ 38), and that his path of flight was in the opposite direction as the line search described by Arthur Hyde, an investigator with the Rensselaer County District Attorney's Office, in his affidavit in support of the government's response, (Stegemann Aff. 3 ¶ 22, Dkt. No. 54

ty on this issue, the government is permitted to file a supplemental brief, within seven (7) days and limited to five (5) pages in length, analyzing the line search under Fourth Amendment principles. Stegemann is permitted to file a response on this narrow issue similarly limited to five (5) pages within seven (7) days of the government's filing.

### 3. Calls Made From Booking Area at Rensselaer County Jail

■ Stegeman moves to "suppress the use or derivative use of recordings of telephone calls made from the Rensselaer County [J]ail," which ultimately led to the seizure of a safe that belonged to him and a subsequent search warrant authorizing the seizure of the currency contained inside. (Dkt. No. 32, Attach. 5.) As explained in his memorandum of law, Steg-

emann claims that he was told that the booking area telephone was not recorded or monitored when, in fact, calls he placed were monitored, and he was in no way warned that the telephone was recorded. (Dkt. No. 37 at 89–91.) Armed with the information they learned from eavesdropping on his booking area calls, police were able to gain possession of a safe, obtain a search warrant for it, and seize the money it contained. (Id. at 90.) Stegemann contends that the monitoring of his jail house calls violates Title III of the Omnibus Crime Control and Safe Streets Act of 1968, as amended,[19] and the Sixth Amendment[20] and must be suppressed. (Id. at 92–93.) The government contends that suppression is not warranted where, as here, the "ordinary course" exception to Title III applies. (Dkt. No. 47 at 55–57.)[21]

at 11–15; Hyde Aff. ¶¶ 1, 17.) It is also undisputed that the April 29 search warrant did not authorize a search of the Foody property. (Dkt. No. 37, Attach. 19 at 10–11.)

On the other hand, Hyde submits that a line search was conducted from the area where Stegemann was apprehended, proceeding east and west, and then north toward the point from which Stegemann fled. (Hyde Aff. ¶ 17.) Presumably, the line search was conducted in order to find any evidence that Stegemann may have discarded or abandoned as he fled. (Dkt. No. 54 at 55.) It was during this "line search" that a narcotics K–9 alerted to narcotics, which were unearthed from a rock pile on the Foody property. (Hyde Aff. ¶ 17) Thereafter, investigators walked K–9s due north and south along a tree line when the investigators located a second rock pile. (Id.) More contraband, specifically, a gun and ammunition, was located within that location, which was also on the Foody property. (Id. ¶ 18.) As explained above, no legal argument is advanced by the government with respect to officers exceeding the scope of the warrant by conducting a line search, or, perhaps, as Stegemann contends in his affidavit, an immediate search of the rock wall.

These factual discrepancies may or may not implicate arguments regarding, among other things, the good faith exception, whether the "line search" was a search at all, or whether

the contraband would have inevitably been discovered.

**19.** See 18 U.S.C. §§ 2510–2522.

**20.** While Stegemann argues that the interception of his jailhouse calls violates his Sixth Amendment rights, (Dkt. No. 37 at 92–93), it is plain to the court that this assertion is meritless. The case cited by Stegemann in support of his argument, *Massiah v. United States*, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964), involved post-indictment police use of a cooperator to elicit incriminating statements from the defendant while officers listened in via a radio transmitter. *Id.* at 202–03, 84 S.Ct. 1199. Logically, the Court viewed the use of the cooperator as the equivalent of police interrogation in the absence of counsel, all of which violated the defendant's Sixth Amendment right. *Id.* at 205–07, 84 S.Ct. 1199. Here, the police did not interrogate Stegemann or otherwise cause him to be interrogated without counsel. Thus, the Sixth Amendment is not implicated.

**21.** The government also argues that, because Stegemann had no expectation of privacy in his calls, his Fourth Amendment rights have not been violated. (Dkt. No. 47 at 57–58.) However, Stegemann has not made a chal-

■ The interception of wire communications is prohibited without prior judicial authorization, and any recordings of such prohibited interceptions are subject to suppression. *See United States v. Friedman*, 300 F.3d 111, 120–21 (2d Cir.2002). By logical extension, evidence adduced through the derivative use of prohibited interceptions is also subject to suppression absent some exception. *See United States v. Calandra*, 414 U.S. 338, 354, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974) ("In the usual context of a criminal trial, the defendant is entitled to the suppression of, not only the evidence obtained through an unlawful search and seizure, but also any derivative use of that evidence. The prohibition of the exclusionary rule must reach such derivative use if it is to fulfill its function of deterring police misconduct."). However, excepted from Title III's prohibitions are "communications intercepted through 'any telephone or telegraph instrument, equipment or facility, or any component thereof … being used by … an investigative or law enforcement officer in the ordinary course of his duties.'" *Friedman*, 300 F.3d at 121 (quoting 18 U.S.C. § 2510(5)(a)). In the Second Circuit, an open question remains as to whether some notice to the defendant that his calls would be monitored and recorded is required prior to the invocation of the so-called "ordinary course" or "law enforcement" exception. *Id.* at 122. Erring on the side of caution, and reading the tea leaves of *Friedman*, this court believes that some notice may be required. As indicated by the Circuit, at a minimum, notice that a reasonable person could understand to mean that his calls would be intercepted will suffice to satisfy the requirement of notice. *See id.* at 122–23. Consistent with the courts that have required some notice,

it is clear that, where the jail has in place a routine or policy of monitoring/recording jailhouse calls and the inmates are in some way informed of that policy, the notice requirement is satisfied. *See, e.g., United States v. Sababu*, 891 F.2d 1308, 1329 (7th Cir.1989); *United States v. Paul*, 614 F.2d 115, 117 (6th Cir.1980).

Here, the court is unable to resolve the motion to suppress based upon Title III in the absence of an evidentiary hearing. Sgt. Ryan swears in an affidavit that he has no memory of discussing the privacy of the booking area phone with Stegemann. (Ryan Aff. ¶ 5.) He denies telling Stegemann that the telephone was not monitored, and further indicates that his normal practice, if asked by an inmate about the privacy of the booking area telephone, was "to advise [him] that everything in the booking area room is recorded on audio and video and that [he] should be cautious about anything incriminating while in [that] area." (*Id.*) Finally, Sgt. Ryan concedes that there are no warnings indicating that the booking area telephone is monitored, but he also alleges that "[t]he booking area telephone, as are all telephones in the Jail, is monitored." (*Id.* ¶ 4.) Stegemann, on the other hand, contends in his affidavit that Sgt. Ryan "assured [him] that the booking phone was not monitored and recorded"; only with Sgt. Ryan's assurances did Stegemann call his mother and uncle. (Stegemann Aff. 1 ¶¶ 112, 116.) Stegemann also claims that the booking area telephone is not part of the inmate telephone system, and an inmate pin number need not be entered as with typical jail telephones. (*Id.* ¶¶ 113, 115.) The apparent factual discrepancies cloud the court's ability to ascertain whether Stegemann had sufficient notice under the circumstances.

---

lenge based upon the Fourth Amendment. He has raised a Sixth Amendment argument,

which, as described above, *see supra* note 20, is without merit.

Thus, an evidentiary hearing on this narrow issue is ordered.

### 4. Wiretaps

Stegemann seeks the suppression of the evidence obtained through the wiretaps. (Dkt. No. 32, Attach. 6; Dkt. No. 37 at 32–71; Dkt. No. 44.) As a preliminary matter, Stegemann argues that Massachusetts law controls the analysis, or is, at least, very important to the admissibility of the intercepted communications. (Dkt. No. 37 at 32–34.) That portion of his argument has already been addressed, and decided against him. *See supra* Part III. A host of arguments are made in support of suppression. They include: (1) lack of necessity; (2) unlawful extraterratorial investigation; (3) lack of notice of interception of calls; (4) lacking probable cause [22]; (5) illegal use of pen registers and trap and trace devices; (6) normal investigative procedures, necessity, and probable cause; (7) lack of minimization; (8) defective returns, service, and sealing; (9) lack of notification of prior applications; and (10) failure to name parties as their identities became known. (Dkt. No. 37 at 32–71; Dkt. No. 44 at 6–10.) In a *pro se* filing, Stegemann adds to his initial arguments that the wiretap warrants are facially invalid because: (1) Justice Agostini was without authority to authorize the use of a mobile interception device under 18 U.S.C. § 2518(3) because he is not a federal judge; (2) there is no proof that Stegemann's telephones were ever within the jurisdiction of the Massachusetts court; and (3) Justice Agostini authorized roving wiretaps, which can only be approved by federal actors. (Dkt. No. 55 at 1–4.)

#### i. Necessity

Stegemann's argument here regarding necessity is distinct from his necessity argument made in support of a *Franks* hearing. (*Compare* Dkt. No. 37 at 19–24, *with id.* at 34–37.) The instant assertion relies entirely on Massachusetts law, (*id.* at 34–37), which, as has been explained several times above, is of no moment. As such, Stegemann's argument is rejected.

#### ii. Extraterritorial Investigation

Simply put, because Stegemann's argument regarding an illegal extra-territorial investigation by Massachusetts police in New York is wrapped up in matters of state wiretap law or the constitutional limits of states' authority, (*id.* at 37–38), it is rejected.

#### iii. Lack of Notice

■ Stegemann's contention regarding lack of notice pertains to calls intercepted as a result of a wiretap investigation of Richard Carnevale while Stegemann was a prison inmate in 2010, which were relied upon in support of the Original Application for a wiretap in this case. (*Id.* at 39–40; Original Application ¶ 55.) Stegemann contends that he was entitled to service of the 2010 wiretap materials within ninety days of the termination of the Carnevale wiretap warrant, and that, in the absence of the required notice, the intercepted communications are inadmissible and irretrievably tainted the original warrant in this case. (Dkt. No. 37 at 40.) Stegemann's claims are rejected.

The calls about which Stegemann complains were intercepted when Stegemann, then an inmate at MCI Shirley, a Massachusetts state prison, called Carnevale on a telephone that was the target of a wiretap investigation. (Original Application ¶ 55.) The intercepted conversations consisted of discussion of Stegemann's plans to return to a life of drug-dealing upon his release from prison. (*Id.*) Stegemann's argument about notice under 18 U.S.C.

---

**22.** The court has already addressed the probable cause argument. *See supra* note 16.

§ 2518(8)(d) ignores the fact that his calls were lawfully intercepted incident to his confinement at a state prison, and that he was on notice that his calls from the prison were recorded. (Scott Aff. ¶ 30(d).) While the court is satisfied that the requirements of Title III do not apply to the Carnevale calls from Stegemann while he was incarcerated at MCI Shirley, even if they did, because Stegemann was on notice that his calls would be recorded as a inmate, he cannot establish bad faith or prejudice as is necessary for suppression based upon a violation of § 2518(8)(d). *See United States v. Ruiz*, No. 09 Cr. 719, 2010 WL 4840055, at *8 (S.D.N.Y. Nov. 19, 2010) ("[A]n unauthorized failure to give notice is not grounds for suppression unless a defendant can establish: (1) bad faith; or (2) prejudice." (citing *United States v. Donovan*, 429 U.S. 413, 438–39, 97 S.Ct. 658, 50 L.Ed.2d 652 (1977))).

### iv. Probable Cause

Justice Agostini's determination that the applications were supported by probable cause is entitled to deference, *see United States v. Machado*, 986 F.Supp.2d 288, 291, 2013 WL 6233900, at *2 (S.D.N.Y.2013) ("In reviewing a ruling on a motion to suppress wiretap evidence, this Court must give considerable deference to the issuing judicial officer's finding, which may be overturned only for an abuse of discretion." (internal quotation marks and citation omitted)), despite Stegemann's convoluted arguments to the contrary, which piggyback on his unavailing *Franks* arguments, (Dkt. No. 37 at 41–42). Reviewing each and every one of the applications, and according the appropriate deference to Justice Agostini, who was neutral and detached, clearly there are minimally adequate facts to support the probable cause findings. *See United States v. Steinberg*,

525 F.2d 1126, 1129–30 (2d Cir.1975); *Vasconcellos*, 658 F.Supp.2d at 383.

▮▮▮ It is also noted that Stegemann's argument that "the 'records from Verizon Wireless of [J.] Cantarella's cellular telephone' contained in the affidavit [in support of the Original Application] must be excised" because of some violation of 18 U.S.C. § 2702(a)(3), a part of the codification of the Stored Communications Act (SCA),[23] (Dkt. No. 37 at 42–43), is bogus. The SCA "affords no suppression remedy for non-constitutional violations. Accordingly, even if [the defendant can show] a violation of the statute, exclusion would not be the appropriate remedy." *United States v. Powell*, 444 Fed.Appx. 517, 520 (3d Cir.2011) (citation omitted).

### v. Pen Registers, and Trap and Trace Devices

Stegemann asserts that pen registers, and trap and trace devices are not permitted under Massachusetts law, and, therefore, could not be used in the investigation. (Dkt. No. 37 at 44–48.) Moreover, he argues that his use of the *67 feature demonstrates his expectation of privacy. (*Id.* at 45–47.) Collectively, Stegemann claims, these two facts mandate suppression under a Fourth Amendment analysis. (*Id.* at 47–48.) The court disagrees.

▮▮▮ Use of pen registers and trap and trace devices is governed by Title III of the Electronic Communications Privacy Act of 1986 (ECPA).[24] As with the SCA, discussed above, *see supra* Part III.C.4.iv, use of pen registers and trap and trace devices in violation of the ECPA does not implicate the Fourth Amendment. *See United States v. German*, 486 F.3d 849, 852–53 (5th Cir.2007) (citing *Smith v. Ma-*

---

**23.** *See* 18 U.S.C. §§ 2701–2712.

**24.** *See* 18 U.S.C. §§ 3121–3127.

*ryland,* 442 U.S. 735, 99 S.Ct. 2577, 61 L.Ed.2d 220 (1979)); *see also* 18 U.S.C. § 3121(d) (providing only a fine or imprisonment as penalties for a violation). Accordingly, "[s]uppression of evidence is not a remedy for alleged violations of the ECPA." *United States v. Navas,* 640 F.Supp.2d 256, 262 (S.D.N.Y.2009), *rev'd in part on other grounds,* 597 F.3d 492 (2010).

Here, Stegemann's argument that a statutory violation compels suppression is plainly without merit. *See id.* Even if his assertion that he occasionally used *67 to obfuscate the identity of one of his telephone numbers, (Stegemann Aff. 1 ¶ 97), implicates Fourth Amendment protections, because, as the Supreme Court has explained, by dialing a number "[a]ll telephone users realize that they must 'convey' phone numbers to the telephone company, since it is through telephone company switching equipment that their calls are completed," *Smith,* 442 U.S. at 742, 99 S.Ct. 2577, he could not have a reasonable expectation of privacy that the numbers he dialed would remain private. Indeed, by using the *67 feature, Stegemann was only achieving what he wanted to: blocking disclosure of his telephone number to the recipient of his call. (Stegemann Aff. 1 ¶ 97.) This argument fails for these reasons.

### vi. Normal Investigative Procedures, Necessity, and Probable Cause

Little can be said here that has not been said elsewhere. In short, Stegemann's contentions falling under this heading, (Dkt. No. 37 at 48–58), are without merit. *See supra* notes 13 & 16; Part III.B & Part III.C.4.iv.

### vii. Minimization

In support of suppression, Stegemann also contends that, because "police failed to minimize any of the intercepted calls in the instant case" and also unlawfully intercepted text messages, suppression is required. (Dkt. No. 37 at 58–60.) The court disagrees.

The government has the initial *prima facie* burden of showing that it complied with minimization requirements; namely, that monitoring agents had reasonable procedures in place that were designed to minimize non-pertinent calls. *See United States v. Rizzo,* 491 F.2d 215, 217 n. 7 (2d Cir.1974). If the government satisfies its *prima facie* burden, the burden shifts to the defendant to show that "a substantial number of non pertinent conversations [have] been intercepted unreasonably." *United States v. Cirillo,* 499 F.2d 872, 881 (2d Cir.1974); *see also United States v. Funderburk,* 492 F.Supp.2d 223, 245–46 (W.D.N.Y.2007) (collecting cases). The government's *prima facie* burden is satisfied by proof of reasonable minimization measures, such as: "1) maintenance of monitoring logs, 2) judicial supervision of the progress of the surveillance, 3) supervision by the prosecutor, and 4) requiring all monitoring personnel to read the minimization instructions, court orders and applications, and the posting of these documents at the monitoring location." *United States v. Gotti,* 42 F.Supp.2d 252, 268 (S.D.N.Y.1999).

Here, the government has met its burden. The state prosecutor "provided all monitoring personnel [with] a detailed minimization briefing and a set of written minimization/monitoring instructions." (Scott Aff. ¶ 21.) All monitoring personnel were also required to read the minimization instructions provided to them along with the wiretap applications and court orders, and the instructions were posted in the wireroom. (*Id.*) The monitoring instructions themselves sufficiently apprised monitoring personnel of the minimization

required by law. (Dkt. No. 37, Attach. 29.) Moreover, twenty-four calls were identified as minimized by Trooper Scott in his Report of Minimized Calls. (Scott Aff. ¶ 21; Dkt. No. 47, Attach. 19.)

■ Upon the shifting of the burden, Stegemann has failed to show that a substantial number of calls were unreasonably intercepted. Indeed, in reply to this argument, Stegemann disputes the minimization of only two calls that Trooper Scott claims were minimized. (Stegemann Aff. 3 ¶¶ 16–17.) He fails to even suggest that those two calls were unreasonably intercepted. In his memorandum of law, Stegemann identifies two other calls, which he claims were non-pertinent and not minimized. (Dkt. No. 37 at 59.) Even if all four calls Stegemann argues were nonpertinent and should have been minimized were unreasonably intercepted, the court is not persuaded that suppression for lack of minimization is necessary in this complex and lengthy wiretap investigation where an untold number of total calls were at issue.

■ Finally, with respect to Stegemann's mention of the illegal interception of text messages, (Dkt. No. 37 at 59), it is noted that the uncontroverted affidavit of Trooper Scott confirms that text messages were *inadvertently* intercepted by the telephone carriers, police reminded the telephone carriers to cease their interception of text messages afterwards, and that the intercepted text messages did not relate to narcotics trafficking. (Scott Aff. ¶ 19.) While the court is troubled by the volume of intercepted text messages indicated by duration entry 0:00:00 on the CDL, (*id.*; Dkt. No. 37, Attach. 21), there is no basis for suppression where, as here, interception was inadvertent and the police notified the carrier to discontinue its interception of text messages. (Scott Aff. ¶ 19.) *See George v. Carusone*, 849 F.Supp. 159, 163 (D.Conn.1994) ("Title III does not proscribe *inadvertent* interceptions."); *see also* 18 U.S.C. § 2511(1)(a) (prohibiting *intentional* interception). In any event, it does not appear that any evidence useful to the government in the prosecution of Stegemann was gained via the inadvertent interception of a text message.

viii. Defective Returns, Service, and Sealing

■ Stegemann argues next that suppression of the wiretaps is necessary because the return materials "are unsigned and unexecuted," and because the "recordings and documents were never judicially sealed." (Dkt. No. 37 at 60–69; Dkt. No. 44 at 7–10.) Without further explanation, Stegemann contends that noncompliance with the sealing and service requirements has "irreparably prejudiced" him. (Dkt. No. 37 at 62, 65, 67, 68.)

■ Under 18 U.S.C. § 2518(8)(a), recordings of intercepted conversations must be judicially sealed "[i]mmediately upon the expiration of the period of the order, or extensions thereof." Where eavesdropping warrants are extended, recordings may be sealed at expiration of the last extension. *See United States v. Fury*, 554 F.2d 522, 532–33 (2d Cir.1977). Recordings sealed within one or two days of the expiration of the wiretap order are considered to have been "immediately" sealed. *See United States v. Vazquez*, 605 F.2d 1269, 1278 (2d Cir.1979). Longer sealing delays do not mandate automatic suppression. *See United States v. Gallo*, 863 F.2d 185, 193 (2d Cir.1988). "[R]ather, suppression is required when the government cannot satisfactorily explain the delay." *Id.* (citations omitted). "The government's explanation must be weighed against such factors as the length of delay, the absence of good faith, the time needed for administrative processing, and the

prejudice to the defendant." *Id.* (citations omitted).

Here, Stegemann's arguments turn entirely on whether the untimely sealing of the wiretaps mandates suppression. First, the court notes that sealing was untimely. The court fully credits the affidavit of Trooper Scott that: (1) the evidence of the Stegemann target telephone wiretap investigation was sealed on June 20, 2013; (2) members of BCDTF believed that they were following the sealing requirements of Massachusetts, which mandates sealing within seven days of the termination of a wiretap warrant or the last renewal thereof; (3) it was the practice of BCDTF, with the guidance of state prosecutors, "that returns and sealing are to be accomplished within seven days after interceptions over the last telephone number being intercepted in connection with the overall investigation ends"; (4) BCDTF followed its own stated practice in this case; (5) BCDTF made no effort to gain a tactical advantage by failing to timely seal; and (6) Scott is aware of no evidence indicating that the recordings have been compromised in any way. (Scott Aff. ¶ 17.) As mandated by § 2518(8)(a), sealing was to occur immediately or, at worst, within two days of the expiration of the warrant, which clearly did not occur here. Despite the delays in sealing—March 22 to June 20 for target number 7010; March 22 to June 20 for target number 7692; April 2 to June 20 for target number 2833; April 21 to June 20 for target number 9425; May 4 to June 20 for target number 7516; April 17 to June 20 for target number 3854; May 4 to June 20 for target number 9502; and May 2 to June 20 for target number 8522, (*id.*)—suppression is not warranted.

While the government could have been clearer, it is inferrable from its memorandum of law that its explanation for delayed sealing boils down to mistake regarding the sealing requirements. (Dkt. No. 47 at 52–53.) The Second Circuit has specifically found the government's explanation that it failed to timely seal because of a mistaken belief in law is sufficient to avoid suppression provided that "there is no basis for inferring that the government sought by means of the delay to gain a tactical advantage over the defendant or that it had any other improper motive" and "there has been no showing that there has been tampering with the tapes or that the defendant has suffered any other prejudice as a result of the delay." *United States v. Rodriguez,* 786 F.2d 472, 477 (2d Cir.1986). Balancing the appropriate factors, the court denies Stegemann's motion to suppress for failure to timely seal. While the delay exceeded three months as to the earliest wiretaps, there is no evidence that Stegemann was prejudiced through compromise of the recordings or that the government employed bad faith to gain a tactical advantage.

### ix. Lack of Notification of Prior Application

This argument is premised upon Stegemann's unsupported belief that police tapped his 2081 telephone. (Dkt. No. 37 at 69–71; Dkt. No. 44 at 3–4.) Stegemann asserts that, by failing to disclose a prior tap on 2081 in subsequent wiretap applications, the police violated the command of 18 U.S.C. § 2518(1)(e). (*Id.*) While Stegemann is correct that a return for the 2081 telephone is part of the record, that return is unsigned, (Dkt. No. 37, Attach. 20), and Trooper Scott has explained that was filed with Justice Agostini in error, (Scott Aff. ¶ 30(f)). What is more, Trooper Scott squarely refutes Stegemann's conjectural assertion that the 2081 number was ever tapped. (*Id.*) As such, this argument is rejected.

### x. Failure to Name Parties

■ Stegemann argues that suppression is required for failure to name parties to the intercept warrant as their identities became known in compliance with 18 U.S.C. § 2518(1)(b)(iv).[25] (Dkt. No. 37 at 71.) In particular, Stegemann claims that the government was required to "amend the wiretap warrants" to reflect the identities of several individuals as their identities became known to police. (*Id.*) This argument fails.

■ Section 2518(1)(b)(iv) is "satisfied as long as the affidavit names 'an individual' for whom there is probable cause to suspect criminal activity." *United States v. Trippe*, 171 F.Supp.2d 230, 235 (S.D.N.Y.2001) (citation omitted). It does not, however, "require that every person whose conversations are intercepted must be named in the application nor does it expressly prohibit the investigative agency from naming other individuals in the application." *Id.* And "failure to comply fully with [§ 2518(1)(b)(iv) ] does not invalidate an order authorizing a wiretap." *United States v. Martin*, 599 F.2d 880, 886 (9th Cir.1979) (citing *Donovan*, 429 U.S. at 432–39, 97 S.Ct. 658), *overruled on other grounds by United States v. De Bright*, 730 F.2d 1255 (9th Cir.1984).

Here, Stegemann's argument fails simply because he has not demonstrated that "known" co-conspirators were omitted from the warrant applications. *See United States v. Geller*, 560 F.Supp. 1309, 1323 n. 11 (E.D.Pa.1983). He provides no proof nor points to anything in the record to indicate when police became aware of the identities of the individuals he mentions and whether or not police had probable cause to believe that the individuals were participants in the conspiracy. Moreover,

it is unlikely that Stegemann is an "aggrieved person" within the meaning of 18 U.S.C. § 2518(10)(a) with respect to this issue. Accordingly, his arguments are rejected.

### xi. Remaining Arguments

■ Lastly, Stegemann argues that the wiretap warrants are invalid on their face. (Dkt. No. 55 at 1–4.) In particular, Stegemann claims that: (1) Justice Agostini ordered the installation of what 18 U.S.C. § 2518(3) defines as "mobile interception devices," which can be authorized only by a federal judge; (2) no evidence has ever supported the notion that his telephones were within the territorial jurisdiction of the Berkshire Superior Court; and (3) the applications fail to meet the requirement of § 2518(1)(b)(ii), which provides that the application "shall include ... a particular description of the nature and location of the facilities from which or the place where the communication is to be intercepted," and Justice Agostini's orders fail to meet the directive of § 2518(4)(b), imposing a similar requirement to specify the nature and location of the communications, and therefore Justice Agostini essentially approved unlawful "roving taps" that did not comply with § 2518(11). (*Id.*) Despite the government's unwillingness to specifically address these contentions, (Dkt. No. 56), all of Stegemann's arguments are without merit.

As to the first of Stegemann's claims that "a mobile interception device may only be utilized upon being 'authorized by a Federal court,' (Dkt. No. 55 at 2–3), he miscomprehends the statute." Section 2518(3) does not prohibit a state court judge from authorizing the use of mobile interception devices. Instead, it merely permits a judge to authorize interception

---

**25.** Notably, Stegemann cites to nonexistent § 2518(b)(iv). (Dkt. No. 37 at 71.) The court presumes that he intended to reference § 2518(1)(b)(iv).

outside of his or her territorial jurisdiction, "but within the United States in the case of a mobile interception device authorized by a Federal court." 18 U.S.C. § 2518(3). The emphasis of the language on which Stegemann focuses is the authority of a judge to order interceptions outside of his or her territorial jurisdiction, not on which judges may order use of mobile interception devices.

Turning to his second argument, Stegemann again focuses on an issue that is ultimately of no moment. The location of Stegemann's telephones indicates interception at only one of two places where interception occurs during a wiretap. Indeed, an interception also occurs at the place "where the scanner used to make the interception is located." *United States v. Ramirez,* 112 F.3d 849, 852 (7th Cir.1997); *see United States v. Rodriguez,* 968 F.2d 130, 136 (2d Cir.1992) ("[A] communication is intercepted not only where the tapped telephone is located, but also where the contents of the redirected communication are first to be heard."). Stegemann's first argument becomes relevant here, however, to the extent that only a federal court may order an interception outside of its territorial jurisdiction. *See* 18 U.S.C. § 2518(3). Bearing in mind that interception occurs in the wireroom or listening post where the redirected communication is first to be heard, and that the wireroom in this investigation was located within Berkshire County, (Scott Aff. ¶ 18), Justice Agostini did not act outside of the authority granted to him under Title III. In addition, the language of the warrants themselves, which permitted interception outside of the jurisdiction of the Berkshire Superior Court if the target telephones were transferred outside of the court's jurisdiction, (*see, e.g.,* Dkt. No. 37, Attach. 3 at 24), should not be read so narrowly as requiring the target telephones to at some point in time be within Justice Agostini's territorial jurisdiction. *See Ramirez,* 112 F.3d at 852.

Lastly, Stegemann's assertion regarding roving wiretaps depends on his claim that, in the absence of the application identifying the Electronic Serial Number (ESN) of the targeted cellular telephone, the applications and orders failed to meet the requirement that they include a full and complete statement of "the nature and location of the facilities from which or the place where the communication is to be intercepted" and specify "the nature and location of the communications facilities as to which, or the place where, authority to intercept is granted," 18 U.S.C. § 2518(1)(b), respectively, and are thus facially invalid. (Dkt. No. 55 at 3–4.)

Stegemann's reliance on *United States v. Goodwin,* 141 F.3d 394 (2d Cir.1997) is also misplaced. *Goodwin* did not require disclosure of ESNs to meet the § 2518(1)(b)(ii) requirement, *see id.* at 403, and subsequent courts have refused to suppress evidence for failure to identify a particular cellular telephone's ESN when the telephone number itself was provided in the application, *see, e.g., United States v. Duran,* 189 F.3d 1071, 1086 (9th Cir. 1999); *United States v. Otibu,* No. S102 CR. 104, 2002 WL 1033876, at *1 (S.D.N.Y. May 21, 2002). Failure to identify a telephone by its ESN limits the permissible interceptions to the particular telephone number identified, however, whereas a tap could continue over a particular cellular device, despite a change in telephone number, if the ESN for the device is identified. *See United States v. Aparo,* 221 F.Supp.2d 359, 371 (E.D.N.Y.2002). Consistent with the logic of *Duran* and *Otibu,* this court finds the identification of the target cellular telephone numbers along with certain user account information was sufficient to meet the demands of § 2518(1)(b)(ii) and

(4)(b) and that suppression is not warranted. (Original Application ¶¶ 26, 76; Dkt. No. 37, Attach. 1 at 4, 18, 29, 43, 50; Addendum B ¶¶ 1, 19; Dkt. No. 37, Attach. 3 at 5, 6, 22; Addendum C ¶¶ 1, 10; Dkt. No. 37, Attach. 4 at 6, 7, 21; Addendum D ¶¶ 1, 10; Dkt. No. 37, Attach. 5 at 5–6, 21; Dkt. No. 37, Attach. 6 at 6, 22; Addendum F ¶ 14; Dkt. No. 37, Attach. 7 at 6, 22; Dkt. No. 37, Attach. 8 at 3, 20; Addendum H ¶ 14; Dkt. No. 37, Attach. 9 at 5, 20; Addendum I ¶ 21; Dkt. No. 37, Attach. 10 at 5, 20; Addendum J ¶ 34; Dkt. No. 37, Attach. 11 at 5–6, 22.)

#### D. *Dismissal of Count Two*

■ In addition to the foregoing, Stegemann seeks the dismissal of count two, charging him with possession of firearms in furtherance of a drug trafficking crime in violation of 18 U.S.C. § 924(c)(1)(A), (Dkt. No. 10), for two reasons. (Dkt. No. 32, Attach. 3.) First, he argues that the government's failure to indict him within thirty days of the filing of the criminal complaint "clearly violates the time mandates set forth in" the Speedy Trial Act. (*Id.* at 2–3.) Second, Stegemann contends that, because the government is unable to establish a nexus between the seized firearms and drug offense, count two is subject to dismissal. (*Id.* at 3–4.) Both arguments are fundamentally flawed, as explained below, and Stegemann's motion is denied.

While Stegemann is correct that 18 U.S.C. § 3161(b) provides that an indict- ment "shall be filed within thirty days from the date on which [the defendant] was arrested or served with a summons in connection with [the] charges," it is beyond dispute that such thirty day time period is subject to a host of exclusions under § 3161(h). Among the time periods excluded are those "period[s] of delay resulting from a continuance granted by any judge . . . on the basis . . . that the ends of justice served by taking such action outweigh the best interest of the public and the defendant in a speedy trial." *Id.* § 3161(h)(7)(A).

Here, Stegemann appeared before Magistrate Judge Randolph F. Treece on June 4, 2013 for an initial appearance, which, by one day, proceeded the filing of the criminal complaint. (Dkt. No. 1.) On June 18, at the request of the parties, Judge Treece excluded sixty days. (Dkt. No. 6.) Under the same circumstances, Judge Treece ordered a thirty-day enlargement of time on August 26, 2013. (Dkt. No. 9.) The indictment was returned on September 18. (Dkt. No. 10.) All of this demonstrates that little more than twenty days ran on the Speedy Trial clock when the exclusions of time ordered by Judge Treece are considered, and, accordingly, dismissal on that basis is not warranted.[26]

■ Turning to Stegemann's second argument, which, in essence, attacks the sufficiency of the government's evidence that may support count two, the government's ability to establish the requisite

---

26. The court notes that, buried within his voluminous submissions and without any legal argument, Stegemann contends—apparently in an effort to demonstrate that, despite Judge Treece's exclusions of time, the Speedy Trial Act was violated—that he was not asked by George Baird, his attorney at the time, whether he consented to an exclusion of time, nor was he informed by Baird that Baird had consented to an exclusion of time. (Stegemann Aff. 3 ¶¶ 1–2, Dkt. No. 54 at 11–15.)

Although not explained as such, it appears that Stegemann argues that his counsel was not permitted to consent to the exclusion of time without Stegemann's express consent. Such an argument ignores the fact that it was Judge Treece's findings that the ends of justice served by granting a continuance outweighed the best interests of the public and Stegemann to a speedy trial. *See* 18 U.S.C. § 3161(h)(7)(A); (Dkt. No. 6 at 4–5; Dkt. No. 9 at 4–5.)

nexus between the firearms and drug trafficking offense is a matter for resolution at trial. Indeed, the indictment is facially sufficient here as it alleges the elements of the charged offense and provides Stegemann with notice of the charge against which he must defend himself. *Compare* (Dkt. No. 10 at 2), *with* 18 U.S.C. § 924(c)(1)(A); *see Hamling v. United States,* 418 U.S. 87, 117, 94 S.Ct. 2887, 41 L.Ed.2d 590 (1974) ("It is generally sufficient that an indictment set forth the offense in the words of the statute itself, as long as those words of themselves fully, directly, and expressly, without any uncertainty or ambiguity, set forth all the elements necessary to constitute the offence intended to be punished." (internal quotation marks and citation omitted)). There is, therefore, no basis to dismiss count two because of a perceived weakness in the government's proof of nexus.

### E. *Lawyer as Witness*

The court *sua sponte* raises an issue regarding whether there are any ethical implications for Stegemann's counsel, Elizabeth Quigley, in light of Stegemann's sworn affidavit related to the money seized from his Greylock Federal Credit Union bank accounts. In particular, Stegemann alleges that Ms. Quigley is the source of some portion of the money seized from his accounts. (Dkt. No. 32, Attach. 1 at 5–6.) Recognizing that it is without any briefing on this issue, the court highlights the potential for Ms. Quigley to act as a witness in relation to the source of the money.

In this District, the New York Rules of Professional Conduct govern the conduct of attorneys. *See* N.D.N.Y. L.R. 83.4(j). Aside from a handful of exceptions, New York's ethical rules generally prohibit an attorney from acting "as advocate before a tribunal in a matter in which the lawyer is likely to be a witness on a significant issue of fact." N.Y. Rules of Professional Conduct rule 3.7, 22 N.Y.C.R.R. § 1200.0. In light of the foregoing, the parties are directed to file supplemental briefing on this issue, stating their respective positions on it, within seven (7) days and limited to five (5) pages.

### F. *Remaining Issues*

Although all of Stegemann's pertinent arguments have been addressed above, any that have not been specifically mentioned are rejected and motions predicated on such arguments are denied.

### IV. *Conclusion*

**WHEREFORE,** for the foregoing reasons, it is hereby

**ORDERED** that Stegemann's motion for a discovery order (Dkt. No. 18) is **DENIED;** and it is further

**ORDERED** that Stegemann's duplicative motion for suppression of evidence derived from wiretaps and aerial surveillance (Dkt. No. 33) is **DENIED;** and it is further

**ORDERED** that in due course, and after the parties have filed their supplemental briefs as provided for below, the Clerk shall schedule an evidentiary hearing as set forth above with respect to Stegemann's argument regarding the suppression of evidence of intercepted telephone calls placed by Stegemann from the booking area of Rensselaer County Jail and all derivative use of that evidence; and it is further

**ORDERED** that Stegemann's motion for a *Franks* hearing (Dkt. No. 32, Attach. 2) is **DENIED;** and it is further

**ORDERED** that Stegemann's motions for suppression of evidence (Dkt. No. 32, Attachs. 1, 6; Dkt. No. 44; Dkt. No. 55) are **DENIED;** and it is further

**ORDERED** that the government may file a supplemental brief, limited to five (5) pages in length, within seven (7) days of the date of this Memorandum–Decision and Order, analyzing the line search under Fourth Amendment principles; Stegemann may file a response on this narrow issue similarly limited to five (5) pages within seven (7) days of the government's filing; and it is further

**ORDERED** that the parties shall file supplemental briefing on the ethical issue raised *sua sponte* by the court limited to five (5) pages in length and within seven (7) days of the date of this Memorandum–Decision and Order; and it is further

**ORDERED** that the court **RESERVES** on Stegemann's motions for suppression based upon the issues to be examined at the evidentiary hearing and by supplemental briefing (Dkt. No. 32, Attachs. 4, 5); and it is further

**ORDERED** that Stegemann's motion for dismissal of count two of the indictment (Dkt. No. 32, Attach. 3) is **DENIED;** and it is further

**ORDERED** that the Speedy Trial clock is tolled, pursuant to 18 U.S.C. § 3161(h)(1)(D), until the conclusion of the evidentiary hearing on Stegemann's motion to suppress, which will be scheduled in due course, and that the period of delay is excluded for computation of the time in which trial must commence under the Act; and it is further

**ORDERED** that the Clerk provide a copy of this Memorandum–Decision and Order to the parties.

**IT IS SO ORDERED.**